**REA EXPRESS, INC., Petitioner,**

**Brotherhood of Railway and Airline Clerks et al., Intervenors,**

v.

**CIVIL AERONAUTICS BOARD, Respondent,**

**Air Freight Forwarders Association et al., Intervenors.**

**No. 380, Docket 74–1611.**

United States Court of Appeals, Second Circuit.

Argued Nov. 21, 1974.

Remanded for Reconsideration Dec. 23, 1974.

Decided after Remand and Reconsideration Oct. 6, 1975.

Bert W. Rein, Washington, D. C. (Kirkland, Ellis & Rowe, Washington, D. C., Arthur M. Wisehart, John J. C. Martin, Peter G. Wolfe, New York City, Anderson, Russell, Kill & Olick, P. C., New York City, of counsel), for petitioner REA Express, Inc.

Peter R. Steenland, Jr., Atty., Civ. Aeronautics Bd., Washington, D. C. (Thomas J. Heye, Gen. Counsel, C.A.B., O. D. Ozment, Deputy Gen. Counsel, Glen M. Bendixsen, Associate Gen. Counsel, Robert L. Toomey, Atty., C.A.B., Washington, D. C., Thomas E. Kauper, Asst. Atty. Gen., Howard E. Shapiro, Atty., Dept. of Justice, Washington, D. C., of counsel), for respondent Civil Aeronautics Bd.

Louis P. Haffer, Washington, D. C. (Robert N. Meiser, Haffer & Meiser, Washington, D. C., of counsel), for intervenors Air Freight Forwarders Association.

Solomon I. Hirsh, Rosemont, Ill. (William J. Donlon, Brotherhood of Railway, Airline & Steamship Clerks, Rosemont, Ill., Reilly, Fleming & Reilly, New York City, Highsaw & Mahoney, Washington, D. C., of counsel), for intervenor Brotherhood of Railway, Airline and Steamship Clerks.

Jerry W. Ryan, Washington, D. C. (Reavis, Pogue, Neal & Rose, Washington, D. C., of counsel), for Emery Air Freight Corp.

Eugene Wallman, New York City (N. Marshall Meyers, Washington, D. C., of counsel), for intervenors Pet Industry Joint Advisory Council, Association of Animal and Fish Distributors, Inc., National Pet Dealers and Breeders Assn.,

Inc., Pet Producers of America, Inc., Florida Tropical Fish and Farm Assn., Inc., Safari Animal Imports, Inc., Gators of Miami, Inc., A–1 Animal Ranch, Inc.

William Q. Keenan, New York City (Martin S. Snitow, Arsham & Keenan, New York City, of counsel), for intervenors National Small Shipments Traffic Conference, Inc., Drug and Toilet Preparations Traffic Conference and Eastern Industrial League, Inc.

Richard A. Hyde, Director Legal Proceedings, United Air Lines, Inc., Chicago, Ill., for United Air Lines, Inc., one of Airlines participating in Air Express Service.

Russell S. Bernhard, Washington, D. C. (Macleay, Lynch, Bernhard & Gregg, Washington, D. C., William C. Burt, Koteen & Burt, Washington, D. C., of counsel, for Airlines participating in Air Express Service.

MANSFIELD, Circuit Judge:

REA Express, Inc. ("REA") has petitioned for review of several orders of the Civil Aeronautics Board ("Board") affecting REA's operations, the most important of which are orders (1) terminating REA's authority as an indirect air carrier to provide "air express" service under an agreement with some 33 United States airlines [1] but authorizing REA to act as an air freight forwarder in lieu of providing "air express" service, and (2) denying REA's application for authority independently to set rates for air express services, free from any veto power by the airlines. The orders had been entered in the Board's *Express Service Investigation* (Dkt. 22388) which had been instituted in 1970 following REA's filing of a complaint with the Board seeking independent rate-making authority and aid in REA's stalemated negotiations with the air carriers.[2] By order dated July 16, 1974, we stayed the Board's orders pending our review.

Upon the argument of this appeal on November 21, 1974, we were informed that on that very date an agreement had been reached between REA and all but six or seven of the air carriers, which would meet most of the Board's objections to the continuation of the air express service as operated jointly by REA and the air carriers. Since friction between REA and the air carriers and their inability to reach a new agreement had been a factor influencing the Board's decision to terminate REA's air express service, we remanded the case to the Board for reconsideration in the light of this new development, retaining jurisdiction over the appeal which had been briefed and argued. By orders dated April 9, 1975, and May 23, 1975, the Board disapproved the latest REA-airlines agreement as not in the public interest and reaffirmed its earlier decision. Thereupon the parties filed additional memoranda directed toward the Board's decision after remand. We affirm the Board's orders under review.

"Air express," the oldest method of shipping air cargo, is a door-to-door priority air cargo service offered only by REA which, pursuant to its agreements with United States air carriers, functions as the single agency responsible for all ground services required to make the shipment, including pick-up, terminal

---

1. The authority was derived from the Board's 1941 decision to the effect that REA, as an indirect air carrier, was granted a temporary exemption pursuant to § 1(2) of the Civil Aeronautics Act of 1938 (which later became § 101(3) of the Act of 1958, 49 U.S.C. § 1301(3)). See *Railway Express Agency (Grandfather Certificate)*, 2 C.A.B. 531, 541 (1941). In 1943 the Board approved the agreements between REA and the air carriers subject to certain modifications. See *Railway Express Agreements,* 4 C.A.B. 157 (1943). The temporary exemption was thereafter extended from time to time and renewal agreements were approved at five-year intervals. The last air express agreement so approved was entered into in 1964 and expired in 1969.

2. A 1970 agreement, which was subject to Board approval of a new higher tariff, collapsed when the Board suspended the tariff and instituted its proceeding entitled "Investigation of Air Service Rates" (Docket 22387).

handling, interline transfers, and delivery to the consignee. In addition to single carrier responsibility, it features single documentation, expedited priority air service, a simplified rate structure, and wide geographical coverage throughout the United States, particularly in small cities which do not generate enough business to support a larger scale air cargo service. Under its arrangements with the airlines, REA issues a single uniform express bill of lading and bills the customer at special air express tariffs which cover door-to-door charges at simplified rates based essentially on commodity and distance and which are shared by REA and the air carriers. The airlines dispatch the customer's shipment on the first available flight to its destination. For the purpose of handling this business REA maintains offices at some 69 airports. At the remaining 500 airports or so REA's ground services are provided by airline personnel.

For many years REA's air express service represented the only method of shipping merchandise by air carrier. Following the Board's decision in *Railway Express Agreements,* 4 C.A.B. 157 (1943), however, the air carriers began offering to the public airport-to-airport "air freight" services to be rendered by the carriers on their own at tariffs posted by the airlines. The shippers and consignees were required, respectively, to deliver and pick up their shipments at the airports involved. In 1948 a third form of air cargo service known as "Air Freight Forwarder" service was authorized by the Board, see *Air Freight Forwarder Case,* 9 C.A.B. 473 (1948), whereby indirect carriers known as air freight forwarders were authorized to pick up freight from shippers at a given point, assemble and consolidate the shipments for transfer by direct air carrier and, upon arrival of the consolidated shipment at its designation, perform breakbulk and distribution functions.

The introduction of competition by direct carrier air freight service and by forwarders resulted in air express eventually developing primarily into a door-to-door small package service, with the average shipment weighing only 27 pounds and moving approximately 500 miles. Air freight forwarders attracted larger size shipments (80-pound average) while the airlines' own air freight service averaged 300 pounds per shipment. Unlike REA the forwarders for the most part could not provide single carrier responsibility and single documentation except for shipments between pick-up and delivery zones of airports covered by their tariffs.[3] As a result most forwarders have tariffs based on the point-to-point tariffs of the direct air carriers with only a few publishing door-to-door tariffs.

Air express service is available at every airport city covered by scheduled air carriers. Although REA maintained at one time 3,000 office or agency locations performing its operations throughout the country, this number has been considerably reduced in recent years. However, the number of cities and towns covered by its services far exceed the facilities offered by forwarders, which generally maintain no facilities at all at the small airport cities except for some "destination" agencies which do not originate shipments.

By the late 1960's the amount of forwarder business was increasing enormously (168% during the period 1966–70) in contrast to REA's air express business, which was virtually at a standstill (3% increase during 1966–70). REA, furthermore, was experiencing acute financial adversity, resulting in substantial annual losses from 1966 to 1974, which led to its institution of Chapter XI bankruptcy proceedings in 1975. The cooperation between REA and the air carriers, which was essential to the successful operation of air express service, faltered. As the airlines increased their own com-

---

**3.** Emery Air Freight Corp., however, has surface freight authority from the ICC which allows it to provide pick-up and delivery service anywhere in the United States, and thus to provide single carrier responsibility and documentation to the same extent as REA.

peting air cargo freight service, their negotiations with REA stalemated and REA, because of its financial plight, had difficulty making payments due the airlines.

In the *Express Service Investigation* REA argued that in order to survive it needed (1) independent rate-making authority, (2) dual authority to provide both air express and air freight forwarding service, and (3) permanent status as the exclusive air express carrier. Fundamental to REA's position was the assumption that air express provides a priority service over a larger geographical area and at a lower cost to the public than air carriers or forwarders and that continuance of air express was therefore in the public interest. However, while the airlines conceded in the *Express Service Investigation* that there was a public need for the existing form of air express service at least with respect to certain types of small shipments (e. g., "life or death" commodities, highly perishable products, animals), the forwarders urged abolition of air express service on the ground that, in view of the increasingly comparable service being provided by them and by the carriers, air express was no longer needed and had the adverse effect of stifling competition and the growth of these other services. The forwarders argued that they could match the service in terms of speed, commodity and geographical coverage. Various shippers, on the other hand, who preferred or were currently dependent on air express service, urged its continuation.

In an initial decision dated May 4, 1972, the Administrative Law Judge ("ALJ") found, among other things, (1) that air express service as represented by the partnership between airlines and REA as a single ground agency had a utility distinguishable from the other air freight services and was in the public interest, (2) that as long as REA engaged in air express service it would be contrary to the public interest to grant it forwarder status, and (3) that the establishment by REA of a special tariff for

air express tariff was unnecessary. Based upon limited elapsed time surveys made by the parties, the ALJ found that, while the bulk of shipments handled by all three services (air express, air freight, and forwarder) were delivered within 48 hours of origination, REA handled the highest percentage of those shipments delivered within 24 hours, with the possible exception of Emery. He further found that REA's priority air express offered the shipper an advantage during holiday seasons and peak traffic occasions, assuring shipment by the first available flight regardless of the time of origination. He further concluded that because of REA's wide commodity coverage and simplified single carrier responsibility and single documentation REA was able to handle small shipments at a lower cost than other services and was able to ship small commodities, such as animals and high security shipments, between points not served by the other services.

The ALJ concluded that if air express should be abolished many shippers would be faced with substantially higher costs for small shipments and small airport cities would be left with the airport-to-airport service of direct air carriers since there would be no air forwarder representation at these points. With respect to REA's request for dual air express-forwarder rights the ALJ reasoned that such authority was not in the public interest because it would give REA an unfair advantage over competing services. Thus in effect the ALJ recommended maintenance of the status quo.

Upon appeal the Board affirmed the ALJ's finding that it would not be in the public interest to grant REA dual air express-forwarder rights or independent rate-making power. These powers, the Board concluded, would enable REA to dominate the indirect air carrier industry, would have an adverse impact on the development of the air freight business, would cause customer confusion, would divert REA's energies from the small shipment-small community service, and would lead air carriers to refuse to

enter into agreements with REA for carriage of cargo originated by REA. Independent rate-making power would, because of lack of cost data and the conflicting interests of REA and the airlines, lead to insoluble regulatory problems and irreconcilable differences between REA and the airlines. It also appeared likely to the Board that REA could through cross-subsidization burden certain types of shipment with costs attributable to others, thus gaining an unfair advantage over other air freight services, enabling it to obtain some of their longer-haul heavier shipments.

The Board further concluded that air express service was no longer in the public interest. Based on its analysis of the record it found that as the nation's general air freight industry had grown many of air express' historical advantages had "withered away." REA's air express business, in contrast to that of the airlines and forwarders, had not increased substantially. Its service was no longer unique since it was not faster than that of the forwarders, which had developed operational techniques comparable and in some instances superior to express service, as reflected by elapsed time surveys. The Board found that with the increase in air cargo space air express' priority rarely had any impact. Although a small percentage of shippers found air express' highly expedited service useful, the Board decided that this need could better be handled by requiring the air carriers to develop a new highly expedited priority service under special tariffs that would be available to all shippers demanding priority service rather than to permit it to be handled solely by REA as a coordinating ground agent.

Conceding that in the past REA had provided broader geographical coverage than the other air freight services, the Board expressed the belief that with the demise of air express the larger forwarders would probably expand their existing coverage, which had already been increased to include virtually every carrier airport city. Furthermore, in view of REA's worsening financial condition the Board believed that REA would be forced to pull out of many small communities and to consolidate its services. With respect to commodity coverage the Board similarly concluded that, in view of the very few items presently handled solely by REA and the likelihood that other air freight services would expand their coverage to handle those commodities, the termination of air express would neither preclude any commodity from moving by air nor result in any community being unserved in the handling of such merchandise. Furthermore, without an economically viable REA and an agreement between it and the airlines, which provided the essential air transportation and at 85% of the airports the necessary ground services, air express service simply would not be able to function.

Having concluded that air express service, which had been handled exclusively by REA, must be terminated, the Board decided that it would nevertheless be in the public interest to grant authority to REA to function as an air freight forwarder, since this would enable it to handle the types of traffic with which it could deal most effectively and to operate without dependency on an agreement with the airlines. In sum, the Board (1) disapproved the REA-airlines agreements for air express service on the ground that such service was no longer in the public interest and accordingly denied REA's requests for dual air express-air freight forwarder authority and for independent rate-making power, (2) terminated REA's temporary authority as the exclusive indirect air carrier for air express, (3) authorized REA to operate nationwide as an air freight forwarder, and (4) directed the air carriers to introduce a new high-priority cargo service designed for shipments requiring highly expedited carriage and delivery.

## DISCUSSION

REA's first contention is that in terminating air express service the Board violated the mandates of the Federal Avia-

tion Act of 1958, 49 U.S.C. §§ 1301(3), 1302 and 1382(b), and of the Administrative Procedure Act, 5 U.S.C. §§ 701–706, by limiting itself to consideration of selected adversarial contentions and by failing to apply "public interest" criteria specified by Congress as the standard in deciding the issues before the Board. See *FPC v. Texaco, Inc.,* 417 U.S. 380, 394–97, 94 S.Ct. 2315, 41 L.Ed.2d 141 (1974). The effect, REA argues, was to "execute" it as a carrier and to harm the shipper interests by distorting the geographic and commodity coverage that would be available to them in the future and by foisting a more expensive forwarder service upon the public. We disagree.

The Board's decision, supplemented by its order on remand, discloses that it observed its responsibilities to REA and to the public, making its "public interest" determinations only after weighing and balancing the essential relevant factors which it was obligated to consider: the shippers' needs, the cargo offered for transport, the nature and extent of the markets and commodities affected, and the characteristics of the three competing services.

▮ The record reveals substantial evidence supporting the Board's findings to the effect that with rare exceptions REA's service is not faster than that of the other types of service, that its priority treatment has become almost entirely meaningless, that its broad geographic coverage is no longer unique in comparison to that of competing forwarder services and that its exclusivity in the transport of certain commodities has disappeared. Being supported by substantial evidence, these findings must stand. Federal Aviation Act of 1958, § 1006(e), 49 U.S.C. § 1486(e); Administrative Procedure Act, § 10(e), 5 U.S.C. § 706(e); *Universal Camera Corporation v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1950).

▮ Although the Board, in carrying out its duty to determine whether a particular form of service will promote "adequate, economical and efficient serv-

ice by air carriers at reasonable charges," 49 U.S.C. § 1302(c), may be obligated, as REA argued, to consider the "comparative economics" of the various types of air service offered, we do not believe that this requires the Board to conduct an investigation in depth into the costs of each type of service of the kind that might be required for a rate determination under 49 U.S.C. § 1482(e), or for a determination as to whether an entirely different kind of service should be initiated, see, e. g., *Schaffer Transportation Co. v. United States,* 355 U.S. 83, 78 S.Ct. 173, 2 L.Ed.2d 117 (1957). Here the Board, acknowledging that REA offered lower rates to small-package shippers for some commodities, concluded that the public need for such service would best be served in the future by opening up air express markets to all indirect air carriers and relying on competitive forces to provide a dependable air freight service for all classes of commodities. We cannot say that its conclusions are unreasonable. Indeed, the Board's conclusion was reinforced by REA's filing in November 1974 of a new tariff (Appendix B to Board's Answering Memorandum dated June 16, 1975, following its adherence upon remand to its earlier decision) raising its rates on many commodities, thus eliminating much of the advantage claimed on the basis of lower rates. Although we are advised that it has since filed still another tariff lowering the rates on some commodities, the interim higher-rate proposal raises questions as to its ability to operate an air express service economically at present rates and as to whether the rates would not be revised upward if REA should continue to operate air express as a monopoly.

▮ We agree with REA that if the public interest mandated the continuance of the present air express system the Board could not properly confuse that issue with the problems inherent in REA's precarious financial condition. On the other hand, in deciding whether the public interest would be served, the Board was not precluded from consider-

ing, among other factors, REA's dire straits, at least in the absence of a showing that some other carrier might conceivably be willing and able to provide air express service. Here, unlike the situation in *Northeast Airlines Inc. v. CAB,* 331 F.2d 579 (1st Cir. 1964), upon which REA so heavily relies, no carrier other than REA would provide air express service. Indeed, REA, operating under the umbrella of a CAB-granted monopoly, is the only carrier that has ever provided that service. In any event, although the Board took REA's uncertain future into consideration, its decision was based firmly on the ground that the public need for air express service had all but vanished with the advent of substitute services.

 Having concluded that the Board's decision to terminate air express service must be upheld, we see no purpose to be served in reviewing the Board's denial of REA's application for independent rate-making authority and dual air express, freight forwarder status except to note that the Board's conclusion that the grant of such authority would not be in the public interest appears, for the reasons stated by the Board, to be reasonably grounded and well within the proper exercise of its powers. Furthermore, there was no need for the Board to postpone its decision with respect to termination of air express service until it had finally determined the issues pending in the *Air Express Rates Investigation* (Docket 22387) or until the airlines had put into effect the new high-priority service as directed by the Board's order. Deferment of the orders presently under review until completion of the rates investigation would unduly delay a step believed by the Board to be essential, i. e., the termination of air express service, without any assurance that the investigation would

yield findings requiring a change in the Board's decision. Since the high-priority service contemplated by the Board is not intended as a replacement of air express service but as an entirely new type of fast, airport-to-airport service not presently available, continuation of air express would not provide an interim substitute for the high-priority service sought by the Board. A further evidentiary hearing of the type ordered in *Ashbacker Radio Co. v. FCC,* 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945), is therefore not required in this case, where the Board has already held one evidentiary hearing. Lastly, for the reasons stated by the Board in its Order on Remand disapproving REA's November 21, 1974, agreement with most of the airlines, that agreement does not change the basic findings upon which the Board based its termination of air express service.

 The Brotherhood of Railway and Airline Clerks ("BRAC") supports REA's application, arguing that the Board failed to make suitable provisions for the welfare of employees who would be displaced by termination of air express service. However, since no proposal was made to the Board for imposition of labor-protective conditions, the matter may not be considered initially by us, Federal Aviation Act of 1958, § 1006(e), 49 U.S.C. § 1486(e). Furthermore, the record reveals that the Board, apparently recognizing employee welfare as a factor to be considered in deciding what course would be in the public interest, *Air Line Pilots Assn. v. CAB,* 154 U.S. App.D.C. 316, 475 F.2d 900, 905 (1973), granted air freight forwarder authority to REA specifically on the ground that its operations as a freight forwarder would provide the best opportunity to benefit its employees.

The Board's orders are affirmed.