**ACME CARTAGE CO. et al., Plaintiffs,**

v.

**UNITED STATES** of America and Interstate Commerce Commission, Defendants.

**D. W. Ramsay Motor Freight, Inc.;** Federal Transfer Co., Inc.; Snider Trucking Service, Inc.; and Western Cartage, Inc., Intervenors.

**Civ. A. No. 3677.**

United States District Court
W. D. Washington, S. D.

Oct. 4, 1968.

———◆———

William B. Adams, of Adams, Mc-Laughlin & Simpson, Portland, Or., George R. LaBissoniere, William Q. Marshall, Seattle, Wash., for plaintiffs.

Gerald Olson, Asst. U. S. Atty., Seattle, Wash., for the United States.

Manny H. Smith, Office of Gen. Counsel, Washington, D. C., for Interstate Commerce Commission.

·George H. Hart, and Jack R. Davis, of Reaugh, Hart, Allison, Prescott & Davis, Seattle, Wash., for Intervenors.

## OPINION

Before HAMLEY, Circuit Judge, and BOLDT and GOODWIN, District Judges.

BOLDT, District Judge:

Plaintiff motor freight carriers operating in the State of Washington brought this action to set aside and annul orders of the Temporary Authorities Board of the Interstate Commerce Commission (hereafter ICC), granting temporary authorities under Section 210a(a) ICC Act, 49 U.S.C. § 310a(a), to seven non-certified motor freight carriers operating within the State of Washington.[1]

"Grandfather" certificates of registration granted to the seven carriers by ICC were held invalid in Black Ball Freight Service v. United States, 266 F.Supp. 287 (WD Wash SD, 1967). Pursuant to that decision, ICC cancelled the certificates. Thereafter the seven carriers filed applications for temporary authority to continue the service previously provided under the cancelled certificates. Notice of the temporary authority applications appeared in the Federal Register and protests were duly filed by plaintiffs. The ICC Board found there was urgent and immediate need for the services for which authority was sought by the applicants and temporary authority to provide the service was granted by orders dated between July 20, 1967 and October 16, 1967.

As authorized by the ICC Act, after extending consideration the ICC adopted Temporary Authority Rules, effective July 5, 1965, specifying procedures for the submission and determination of temporary authority applications under Section 210a(a), ICC Act. Ex Parte No. MC–67, 49 CFR 1131. The rules specifically provide in mandatory terms that each filed temporary authority application must be accompanied by one or more supporting statements and each such statement must contain at least the information specified in eleven categories.[2]

---

1. Interstate Commerce Act, Section 210a (a), as amended, 49 U.S.C. § 310a(a), provides:

   "To enable the provision of service for which there is an *immediate and urgent need* to a point or points within a territory having *no carrier service capable of or meeting such need*, the Commission may, in its discretion and without hearings or other proceedings, grant temporary authority for such service by a common carrier or contract carrier by motor vehicle, as the case may be. Such temporary authority, unless suspended or revoked for good cause, shall be valid for such time as the Commission shall specify, but for not more than an aggregate of one hundred eighty days, and shall create no presumption that corresponding permanent authority will be granted thereafter." (Emphasis added.)

2. Ex Parte No. MC–67, 49 CFR 420.2, 49 CFR 1131.2, provides:

   "(b) How and Where Filed. A separate application for each temporary authority sought must be filed on Form BOR–95 (§ 1003.1 of this chapter). The signed original and six copies of each application and all supporting documents *must be* filed with the Bureau of Operations Field Office which has jurisdiction over the point at which applicant is domiciled, or such other field office as the Commission may designate in special circumstances.

   "(c) Supporting Statements. *Each application for temporary authority must be accompanied by a supporting statement(s) designed to establish an immediate and urgent need for service which cannot be met by existing carriers*, except that when the Department of Defense is the shipper

Two of those are:

"(8) Whether efforts have been made to obtain the service from existing motor, rail or water carriers, and the dates and results of such efforts.

"(9) Names and addresses of existing carriers who have either failed or refused to provide the service, and the reasons given for any such failure or refusal."

Plaintiffs assert that not a single one of the supporting letters accompanying the temporary authority applications of the seven carrier applicants provided the information required by either of the two above quoted rule provisions. Plaintiffs contend that granting of the temporary authorities in question without a showing of the required information was arbitrary, capricious and erroneous in law. At argument, counsel for defendants conceded that the required information was not contained in any of the supporting letters. Intervenors (four of the seven applicants) contended otherwise and, with leave, after argument filed a memorandum in support of their contention which the court has fully considered. The defendants and Intervenors contend the Temporary Authority Rules are merely "guidelines" for ICC action and not to be construed as limiting the broad discretion of ICC in granting temporary authorities pursuant to Section 210a(a) of the ICC Act. Also, they urge that any failure of the ICC to enforce its rules in the particulars above referred to does not show the action taken upon the temporary authorities in question was arbitrary, capricious or unlawful.

■ Contrary to the suggestion of defendants and Intervenors, we find and hold it unmistakably clear that neither the term "carrier service" in section 210a(a) of the ICC Act nor the term "existing carrier", as used in § (8) and § (9) of 1131.2(c) above quoted, refers to services by applicants for temporary authority to provide the needed services

such support may be furnished directly to the Temporary Authorities Board by the Washington office of that Department. Each such shipper's statement, except those submitted by the Department of Defense, must contain a certification of its accuracy and must be signed by the person (or an authorized representative thereof) having such immediate and urgent need for motor carrier service. *Any such supporting statement must contain at least the following information*:

(1) Description of the specific commodity or commodities to be transported (where the transportation of property is involved).

(2) Points or areas to, from, or between which such commodities or passengers are to be transported. (If service is needed to or from a territory or area rather than a specific point or points, clearly describe such territory or area and furnish evidence of a broad need to justify the territorial grant of authority requested.)

(3) Volume of traffic involved, frequency of movement, and how transported now and in the past.

(4) How soon the service must be provided and the reasons for such time limit.

(5) How long the need for such service likely will continue, and whether the persons supporting the temporary application will support a permanent service application.

(6) Recital of the consequences if service is not made available.

(7) The circumstances which created an immediate and urgent need for the requested service.

(8) Whether efforts have been made to obtain the service from existing motor, rail, or water carriers, and the dates and results of such efforts.

(9) Names and addresses of existing carriers who have either failed or refused to provide the service, and the reasons given for any such failure or refusal.

(10) Name and address of motor carrier who will provide service and is filing application for temporary authority.

(11) If the person supporting the application has supported any prior application for permanent or temporary authority covering all or any part of the desired service, give the carrier's name, address, and motor carrier docket number, if known, and state whether such application was granted or denied and the date of such action, if known." (Emphasis added.)

in question. Therefore, the requirement of information pertaining to "existing carriers" in the above quoted regulations is not satisfied by supporting statements concerning service by the applicant "grandfather" carriers.

From our examination of the supporting letters attached to each of the applications in question, we find none of them approaches compliance with, or provides the information required by, either § (8) and § (9) above quoted. We do not find the information specified in those subsections otherwise shown or referred to of record in the present case.

■ Under sub-section 1131.3(a) (2) of the Temporary Authority Rules, any interested carrier who can and will provide all or any part of the proposed service for which temporary authority is sought may protest against temporary authority applications to provide such service.[3] Any such protest must state the specific service the protestant can and will offer to shippers needing the service. There is no indication ICC questioned the sufficiency of plaintiffs' protests and they are not challenged in this case. If any shipper, whether or not it submitted a letter in support of any temporary authority application in question, made reasonable inquiry as to the identity of carriers certified to provide the needed service within the territory in question, or specifically requested any plaintiff carrier to provide the needed service at any time and particularly during the period between the cancellation of the licenses of applicants and the filing of their applications for the temporary authorities in question, there is no evidence or indica-

tion thereof in the record before this court. At most, the supporting letters state a preference of the letter writers for continuance of service by the applicants. It is clear to us the mere preference of shippers to use non-certified carriers for needed service does not indicate and certainly does not establish that carriers certified by ICC to operate within the territory in question are not capable of providing the needed service.

■ By its terms, 49 U.S.C. § 310a (a) vests discretion in ICC to grant temporary authority for motor carrier services only when both of the two conditions specified in the statute are shown, i. e. (1) "an immediate and urgent need * * * [for] service" (2) "within a territory having no carrier service capable of meeting such need". When both conditions exist, the statute provides for wide latitude in the exercise of the discretion ICC may exercise in granting temporary authority applications. However, before ICC can exercise that discretion it is clear from the language of the statute that concurrent existence of both conditions (1) and (2) is mandatory and absent either one of the conditions ICC has neither power nor discretion to grant temporary authority applications.

■ As recited in the Temporary Authority Rules, they are "designed to implement the statute". Nothing in the Rules is more basic or important to that purpose than the provisions designed to aid in fair and sound determination of the statutory conditions mandatorily required for the exercise of either power or discretion by the ICC in granting temporary authority.[4] Obviously, the informa-

---

3. "1131.3(a) (2) Filing of Protests. Any interested persons who can and will provide all or any part of the proposed service may file a protest against the application. Such protest must be specific as to the service which such protestant can and will offer * * * "

4. The essential purposes of the rules and the vital importance of compliance with the very rule provisions involved in this case has been recognized by ICC itself.

The following ICC policy release was issued January 23, 1968:
"POLICY CLARIFIED FOR ICC ACTION ON APPLICATIONS FOR TEMPORARY AUTHORITY TO CONDUCT MOTOR CARRIER OPERATIONS.
"Requests for temporary authority to conduct regulated motor carrier service will be turned down if the applications do not adequately comply with Interstate Commerce Commission rules.

tion required by § (8) and § (9) bears directly and specifically on one of those two conditions, i. e., whether the urgently needed service can and will be provided by existing certified carriers. Enforcement of reasonable compliance with these particular provisions appears desirable in regular practice but their enforcement is essential when, as in this case, several certified protestants have asserted ability and willingness to provide the needed carrier service in question and evidence to the contrary is not shown of record. Variable and unpredictable enforcement of important and mandatorily stated rule provisions is inequitable in principle and unsound in practice. If particular rules prove overrigid or otherwise unsatisfactory in practice they can be amended as experience dictates. Service v. Dulles, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); Accardi U.S. ex rel. v. Shaughnessy, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954); Columbia Broadcasting System, Inc. v. United States, 316 U.S. 407, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942).

■ Having adopted Rules emphatically requiring temporary authority applicants to provide the essential information specified in § (8) and § (9), we find it capricious and arbitrary for ICC, without good cause shown, to ignore or waive compliance with these critically important rule provisions. At a minimum, we

find it so when the essential information § (8) and § (9) require to be provided does not appear elsewhere in the record.

For the reasons stated, it appears as a matter of law that the temporary authorities in question were erroneously granted and that each of them should be and hereby is held null and void.

It is so ordered.

"The clarified policy will be administered by Division 1, which handles operating rights matters.

"The Commission adopted this policy upon receiving recommendation from the Division because of the haphazard preparation of many of the more than 5,000 applications for temporary authority received annually. Most of the requests involve common carrier trucking. The applications usually result from an emergency or short term need of shippers, or when new products and commodities are developed and require immediate transportation services.

"*Because of 'slip-shod' preparation of many of the applications, the Division frequently has found it difficult to reach an informed and equitable decision.* Further investigation by the ICC staff often has been required in order

to obtain necessary information. *Foremost among the complaints in this area are those concerning failure of the applicant or his representative to submit supporting statements which contain all of the information required by Section 240.2(c) of the Temporary Authority Rules.* These rules are set forth in Ex Parte No. MC–67, Motor Carrier Temporary Authorities, 98 MCC 483, and 49 CFR 1131 (formerly 49 CFR 340).

"According to the clarified policy, Division 1 will deny temporary authority applications in which, because of noncompliance with the rules, a fair adjudication is not possible on the record before the Commission, without prejudice, however, to the filing of a new application conforming to the rules." (Emphasis added.)