**ESTES EXPRESS LINES et al.,
Plaintiffs,**

**v.**

**UNITED STATES of America and Interstate Commerce Commission,
Defendants,**

**and**

**Railway Express Agency, Incorporated,
Intervenor Defendant.**

**Civ. A. No. 4821–A.**

United States District Court
E. D. Virginia,
Alexandria Division.

Argued Oct. 3, 1968.

Decided Nov. 13, 1968.

Francis W. McInerny, Harry J. Jordan, MacDonald & McInerny, Washington, D. C., Linwood C. Major, Jr., Major, Sage, Vance & King, Alexandria, Va., for plaintiffs.

C. Vernon Spratley, Jr., U. S. Atty., Alexandria, Va., Edwin M. Zimmerman, Asst. Atty. Gen., Gregory B. Hovendon, Dept. of Justice, Washington, D. C., for the United States.

Robert W. Ginnane, Gen. Counsel, Raymond M. Zimmet, I. C. C., Washington, D. C., for the I. C. C.

H. Merrill Pasco, Hunton, Williams, Gay, Powell & Gibson, Richmond, Va., John C. Ashton, Jr., William H. Marx, New York City, for Railway Express Agency, Inc.

Before BUTZNER, Circuit Judge, and LEWIS and KELLAM, District Judges.

BUTZNER, Circuit Judge:

The plaintiffs, motor carriers, seek to annul orders of the Interstate Commerce Commission granting the Railway Express Agency, Inc., temporary authority to operate as a motor carrier over regular routes transporting general commodities in express service between Washington, D. C., and Richmond, Virginia, including several intermediate off-route points.[1] Finding the Commission did not abuse its discretion, we dismiss the complaint.

For many years, REA used the Richmond, Fredericksburg & Potomac Railroad for express shipments between Washington, D. C., and Richmond, Virginia. After receiving notice that the R. F. & P. would discontinue less than carload express shipments over this route, REA applied for "emergency" authority and "temporary" authority under § 210a(a) of the Interstate Commerce Act[2] to continue its shipments by truck over highways that generally parallel the R. F. & P.'s tracks. The Commission ex parte allowed REA to operate under emergency authority. Later, the Commission granted REA temporary authority pending determination of its application for a permanent certificate.

In support of its application for emergency and temporary authority, REA filed an affidavit of one of its officers and statements from eleven shippers. In its statement REA alleged that it offers nationwide express service with air, motor, boat, and surface connections, and that the proposed route was a necessary link in this nationwide system. It proposed that inbound traffic arriving at Washington and Richmond throughout the day and night would be accumulated and then transported in the early morning hours in time for same day delivery. Outbound shipments would depart originating points in the afternoon, allowing prompt connection with through trains, trucks, and planes at Washington and Richmond. The statement further alleged that REA had no knowledge of any carrier in the territory which had nationwide surface, air, motor, and other connections providing co-ordinated express services.

The protesting carriers did not allege that they held themselves out to the public as providing the same co-ordinated, nationwide services for express as REA. They alleged that they move commodities similar to REA's, that they can handle express shipments between Washington and Richmond, and that they interline with other carriers. They recognize REA's dual capacity as a carrier and a "consumer" of carrier services, and they emphasize that by interlining with REA they can provide the same service that was previously available.

[1] On December 7, 1967, the Commission, by its Temporary Authorities Board, granted REA 120-day temporary authority. Railway Express Agency, Inc., New York, New York, Docket No. MC 66562 SUB 2262 TA. On January 30, 1968, the Commission, by Division 1 acting as an Appellate Division, denied petitions for reconsideration.

[2] Section 210a(a) of the Interstate Commerce Act [49 U.S.C. § 310a(a)] provides in part:

"(a) To enable the provision of service for which there is an immediate and urgent need to a point or points or within a territory having no carrier service capable of meeting such need, the Commission may, in its discretion and without hearings or other proceedings, grant temporary authority for such service by a common carrier or a contract carrier by motor vehicle, as the case may be. Such temporary authority, unless suspended or revoked for good cause, shall be valid for such time as the Commission shall specify, but for not more than an aggregate of one hundred and eighty days, and shall create no presumption that corresponding permanent authority will be granted thereafter."

The carriers principally complain that the shippers' statements in support of REA's application lack the particularity required by Commission regulations. Title 49 C.F.R. § 1131.2(c) requires each supporting statement to contain detailed information on the shipper's needs, including answers to the following:

"(8) Whether efforts have been made to obtain the service from existing motor, rail, or water carriers, and the dates and results of such efforts.

"(9) Names and addresses of existing carriers who have either failed or refused to provide the service, and the reasons given for any such failure or refusal."

In answer to these questions, each shipper said:

"I am currently obtaining the service I need from REA Express, and, accordingly, have had no occasion to seek express service from anyone else. Within my knowledge, however, no service other than that of REA possesses all of the special characteristics required for adequate handling of my express shipments. If REA service became unavailable, I would have an immediate and urgent need which no other carrier could meet."

■ We do not agree that the Commission erred in considering these statements. Inquiries (8) and (9) of the regulations were reasonably answered when the shippers explained why they had made no effort to obtain express service from existing carriers. The statements were sufficiently particular to alert the Commission to the continuing shipping needs of the merchants. Furthermore, the Commission could consider the statements along with REA's supporting statement and in the light of the failure of the carriers to allege facts showing that they were providing transportation comparable in all respects to REA's.

In Acme Cartage Co. v. United States, 290 F.Supp. 453 (W.D.Wash., 1968), the supporting shippers' omission, without good cause, of answers to questions (8) and (9) was held to be fatal. That case, however, is inapposite. There both the applicants and the protestants were engaged in motor freight transportation, and the protestants held themselves out to the public as providing service identical to that proposed by the applicants. Also, the court emphasized that the information sought by inquiries (8) and (9) did not appear elsewhere in the record. Here lack of comparable service is indicated by the shippers' statements, REA's statement, and, indeed, can be inferred from the protest itself.

■■ Finally, we conclude that the plaintiff's contentions that the Commission violated congressional policy against unrestricted railroad entry into the motor carrier field and that its orders are not supported by substantial evidence are premature. Section 210(a) of the Act "conceives a summary disposition of the application." Alabama Great So. R. R. Co. v. United States, 103 F.Supp. 223, 226 (E.D.Va.1952). The fact that REA had handled 141,696 express items during the period from August 1966 to July 1967 on the R. F. & P., the precipitous discontinuance of railroad facilities, the lack of comparable motor service, and the continuing requirements of the shippers show an immediate and urgent need for REA's express service. Resolution of other issues may properly await a decision on REA's application for permanent authority.

The Commission's exercise of its discretionary authority was not arbitrary or capricious. The complaint is dismissed.