**REA EXPRESS, INC., Bankrupt, L. Orvis Sowerwine, Trustee in Bankruptcy, Petitioner,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Respondents.**

**No. 1165, Docket 76–4278.**

United States Court of Appeals, Second Circuit.

Argued May 23, 1977.

Decided Sept. 16, 1977.

Certiorari Denied March 20, 1978.

John M. Cleary, Washington, D. C. (John K. Maser, III, and Donelan, Cleary, Wood & Maser, Washington, D. C.; Donald L. Wallace, and Whitman & Ransom, New York City; Marcus & Angel, New York City, on the brief), for petitioner REA Express, Inc., Bankrupt, L. Orvis Sowerwine, Trustee in Bankruptcy.

J. William Cain, Jr., Washington, D. C. (Jack R. Turney, Jr. and Robert R. Redman, Washington, D. C.; Tibor Sallay, White Plains, N. Y., on the brief), for intervenor

Alltrans Express U.S.A., Inc. in support of petitioner.

John O'B. Clarke, Jr., Washington, D. C. (James L. Highsaw, and Highsaw, Mahoney & Friedman, Washington, D. C.; David J. Fleming, and Reilly, Fleming & Reilly, New York City; William J. Donlon, Rosemont, Ill., on the brief), for intervenor Brotherhood of Railway and Airline Clerks in support of petitioner.

Henri T. Rush, Atty., ICC, Washington, D. C. (Mark L. Evans, Gen. Counsel, ICC, and Charles H. White, Jr., Assoc. Gen. Counsel, ICC, Washington, D. C.; Donald I. Baker, Asst. Atty. Gen., and Lloyd John Osborn, Atty., Dept. of Justice, Washington, D. C., on the brief), for respondents United States and I. C. C.

John W. Bryant, Detroit, Mich., and Todd A. Peterman, Washington, D. C. (Richard H. Streeter, Edward K. Wheeler, and Wheeler & Wheeler, Washington, D. C.; Eames, Petrillo & Wilcox, Detroit, Mich.; Phillip Robinson, and Robinson, Felts, Starnes & Nations, Austin, Tex.; Nelson J. Cooney, Washington, D. C.; Daniel C. Sullivan, and Singer & Sullivan, Chicago, Ill., on the brief), for intervening respondents in support of the I. C. C.

Before WATERMAN and TIMBERS, Circuit Judges, and MEHRTENS, District Judge.*

---

* Hon. William O. Mehrtens, Senior United States District Judge, Southern District of Florida, sitting by designation.

1. The two orders of the Commission which are the subject of the instant petition to review were entered November 17, 1976 and January 27, 1977 in consolidated Docket No. MC–C–8862, *Brada Miller Freight System, Inc. v. Rexco, Inc. and REA Express, Inc.* (unreported).

2. § 206(a)(1) of the Interstate Commerce Act, 49 U.S.C. § 306(a)(1) (1970), in relevant part provides:

 "Except as otherwise provided in this section and in section 310a of this title, no common carrier by motor vehicle subject to the provisions of this chapter shall engage in any interstate or foreign operations on any public highway, or within any reservation under the exclusive jurisdiction of the United States, unless there is in force with respect to such carrier a certificate of public convenience

---

TIMBERS, Circuit Judge:

On this petition to review orders [1] of the Interstate Commerce Commission (the Commission), the essential questions are whether the Commission acted arbitrarily and capriciously and abused its discretion in dismissing for want of prosecution the application of the trustee in bankruptcy of REA Express, Inc. (REA) under § 206(a)(1) of the Interstate Commerce Act (the Act), 49 U.S.C. § 306(a)(1) (1970),[2] for permanent operating authority of a nationwide "Hub" system of express service and at the same time in revoking the temporary authority previously granted to REA under § 210a(a) of the Act, 49 U.S.C. § 310a(a) (1970).[3]

We hold that the Commission did not act arbitrarily and capriciously and did not abuse its discretion. Accordingly we deny the petition to review and affirm the orders of the Commission.

## I. FACTS AND PRIOR PROCEEDINGS

### (A) *REA and the Hub System*

■ "Express service", as defined by the Commission, entails the expedited carriage of goods upon firmly established schedules. The express carrier, whose services command premium rates, also must provide special handling for small parcels. *REA Express, Inc., Application for ETA,* 117 M.C.C.

---

and necessity issued by the Commission authorizing such operations. . . ."

3. § 210a(a) of the Interstate Commerce Act, 49 U.S.C. § 310a(a) (1970), provides:

 "To enable the provision of service for which there is an immediate and urgent need to a point or points or within a territory having no carrier service capable of meeting such need, the Commission may, in its discretion and without hearings or other proceedings, grant temporary authority for such service by a common carrier or a contract carrier by motor vehicle, as the case may be. Such temporary authority, unless suspended or revoked for good cause, shall be valid for such time as the Commission shall specify, but for not more than an aggregate of one hundred and eighty days, and shall create no presumption that corresponding permanent authority will be granted thereafter."

80, 88–89 (1971); *Railway Express Agency, Inc., Extension-Nashua, N. H.,* 91 M.C.C. 311, 324 (1962). During the first half of this century express service was provided as an adjunct of the operations of the nation's railroads. In 1929 the railroads joined together to establish Railway Express Agency, Inc. (Railway Express), a non-profit agency designed to operate all express services provided by the railroads under their joint ownership and control. The non-profit arrangement continued until 1969. In that year the participating railroads, which were dissatisfied with Railway Express' continuous losses, extricated themselves from its ownership. *REA Express, Inc. v. Alabama Great Southern Railroad Co.,* 343 F.Supp. 851 (S.D.N.Y.1972), *aff'd,* 412 U.S. 934 (1973). REA, the bankrupt herein, emerged as an independent company which carried on the business of Railway Express.

Upon the organization of REA in 1969, it provided express service with a routing system significantly different from the railroad oriented system which its predecessor had operated. The steady decline in railroad passenger service after World War II had forced Railway Express into increasing reliance on supplementary operations by motor carrier. By 1962 it had acquired nearly 1,700 separate motor carrier operating rights from the Commission. These piecemeal acquisitions left Railway Express with an uncoordinated and unmanageable system of interlocking rail and motor routes. It consequently decided that a fundamental restructuring of its routing system was necessary.

In 1968 Railway Express submitted to the Commission under § 206 of the Act an application for permanent operating authority for a "Hub" system of operations. The salient feature of such system was its selection of 24 central points or hubs for the dispatch and receipt of traffic. Each hub was connected with each other hub by a regular motor route or rail line-haul route. A "satellite" area, served exclusively by motor carrier, surrounded each hub. All traffic to and from locations within the satellite area moved via the hub city. Railway Express, pursuant to § 210a(a) of the Act, made the usual application for temporary authority pending the Commission's action on its application for permanent authority. The Commission found that Railway Express met the "immediate and urgent need" requirement of § 210a(a) for its Hub service and accordingly granted the temporary authority. *Saginaw Transfer Co. v. United States,* 312 F.Supp. 662 (E.D. Mich.1970) (three-judge court); *Estes Express Lines v. United States,* 292 F.Supp. 842 (E.D.Va.1968) (three-judge court), *aff'd,* 394 U.S. 718 (1969) (per curiam) (grant of temporary authority sustained).

Railway Express commenced Hub operations in 1968 under the temporary authority. Its successor, REA, took no effective steps thereafter in prosecuting the permanent authority application. It relied on the temporary authority granted to Railway Express for continued Hub operations during the entire period of REA's existence. Once the Hub system was placed in operation under the temporary authority, it proved a disappointment to REA. As a result, in 1971 REA sought to abandon the Hub system and to replace it with a new system of irregular route service. In its new application for temporary authority REA represented that, despite strenuous efforts to implement the Hub system, it nevertheless had proved both "costly and inefficient for REA, and inadequate in providing service to the public." On August 9, 1971 the Commission denied the new application on the grounds that no immediate and urgent need had been demonstrated and the irregular route service proposed would be inconsistent with the concept of express service.

Although REA carried on under the temporary Hub authority, its actual operations departed significantly from those contemplated in the 1968 application. Referring to Hub operations in general, the Commission stated in its 88th Annual Report, at 54–55 (1974):

"The [Hub] concept proved to be inefficient, necessitating considerable exceptions to the basic operating plans. . . .

[T]he system today bears little resemblance to the original concept. . . ."

## (B) *REA's Bankruptcy and the Rexco Division*

REA's operations continued to decline. As a result of the recession and other factors,[4] on February 18, 1975 it filed a petition for an arrangement under Chapter XI of the Bankruptcy Act in the Southern District of New York. The company continued operations as the debtor in possession until November 6, 1975. On that date it was adjudicated a bankrupt and ordered liquidated. Regular express services ceased the following day. Since then liquidation has been substantially completed. REA no longer has any operational capability.

Backing up for a moment to August 1975 —during the period of REA's unsuccessful reorganization proceeding—we come to the event which precipitated the Commission's proceedings here under review: establishing the Rexco Division of REA. Rexco amounted to little more than a brokerage business. Independent agents stationed at various locations east of the Rockies and acting on a commission basis solicited truckload traffic from shippers and then arranged for carriage in owner-operated trucks. A small Rexco office near Philadelphia solicited some business, but its chief function was billing shippers and paying agents and owner-operators. Rexco did not own or operate any equipment. It employed no drivers. It exerted little direct control over the operations carried on in its name. It failed to comply with the regular-route restrictions in REA's operating authorities and with the governing REA tariff. And by dispensing with fixed schedules and limiting itself to truckload shipments, Rexco lost any resemblance to the "express service" which REA was authorized to perform.

## (C) *Proceedings before the Commission and the Alltrans Application*

Particularly on longer hauls, Rexco undersold competing irregular-route carriers. Its business grew rapidly. Apparently because Rexco was the only profitable REA operation, the REA trustee in bankruptcy on November 10, 1975 amended his embargo notice so as to exempt Rexco from the embargo on all REA operations which the trustee, upon taking office three days earlier, had placed on all traffic tendered to REA. By December 11, 1975, 18 of the motor carriers whose business Rexco had been diverting responded with complaints filed with the Commission seeking a cease and desist order against Rexco's unlawful operations. On December 1, American Trucking Associations, Inc. (ATA), one of the intervening respondents herein, filed with the Commission a petition seeking dismissal of the still-pending 1968 application for permanent Hub authority and concomitant revocation of the 1968 temporary authority for failure to prosecute the application in violation of Rule 247(f) of the Commission's General Rules of Practice, 49 C.F.R. § 1100.247(f) (1976). On April 5, 1976 the Commission entered an order consolidating all proceedings arising from the motor carriers' complaints and the ATA petition. *Brada Miller Freight System, Inc. v. Rexco, Inc. and REA Express, Inc.,* Docket No. MC–C–8862.

On July 27, 1976, one day before the Commission set a date for oral hearings in the consolidated proceedings against REA, a bankruptcy judge in the REA Express, Inc. bankruptcy proceedings approved an agreement between the REA trustee and intervenor Alltrans Express U.S.A., Inc. (Alltrans) for the purchase of REA's outstanding permanent and temporary authorities. The agreement provided for down

---

4. In 1946 REA handled 235 million surface shipments. By 1971 this figure had declined 94% to 14.5 million shipments. In 1973 the figure dropped to 9.99 million, in 1974 to 8.96 million. Revenues from surface traffic, which amounted to $350 million in 1965, had declined to $168.5 million in 1974.

REA's air express operations, which accounted for a substantial portion of its revenues, also declined. The number of shipments fell from 6.54 million in 1973 to 4.81 million in 1974. Revenues dropped from $107.4 million to $103.2 million during the same period.

payment of $2.5 million and a guaranteed minimum rental and purchase price of $9.6 million. It also contemplated that by September 25, 1976 Alltrans would file applications with the Commission for transfer of REA's authorities pursuant to §§ 5(2)(a) and 210a(b) of the Act, 49 U.S.C. §§ 5(2)(a) and 310a(b) (1970).[5] See *In the Matter of REA Holding Corporation (Manning v. Sowerwine)*, 558 F.2d 1127, 1129–30 (2 Cir. 1977). (dismissal of creditors Chapter X petition affirmed).

The essential elements of this agreement were the application for permanent Hub authority and the temporary authority, the continuing validity of which already had been drawn into question by ATA's petition of December 1, 1975. To assure the success of the Alltrans contract, the trustee therefore sought to delay the consolidated proceedings. On July 28 the Commission set the matter for hearing beginning August 30 before an Administrative Law Judge (ALJ). The trustee responded with a petition requesting a postponement of at least 45 days. He contended that adjudication of ATA's petition would frustrate the imminent transfer applications by Alltrans under §§ 5(2)(a) and 210a(b) and that priority consideration of the transfer applications would "moot" the questions raised by ATA's petition. On August 24 the Commission denied the trustee's petition.

On August 30 the hearing commenced as scheduled. It extended through September 22. On October 15 the Commission announced that in order to expedite proceedings it would dispense with an initial decision by the ALJ and that the full Commission would decide the matter on the record as certified by the ALJ[6] and on the briefs of the parties. It did so on November 17 by filing its report and order to which the instant petition to review is chiefly addressed.

The Commission held that the Rexco operation was outside the definition of express service and beyond the scope of REA's operating authorities. Accordingly it directed that a cease and desist order be entered prohibiting continued operation of Rexco by the trustee. With respect to ATA's petition for dismissal of the application for permanent Hub authority, the Commission found

"That applicant REA . . . has failed to prosecute its application in a timely manner; that applicant is not shown to be capable of prosecuting the application; that attempted prosecution of the application would not appear likely to result in a feasible operation consistent with the public interest and the national transportation policy or required by the public convenience and necessity such that any appropriate authority would be

**5.** § 5(2)(a) of the Interstate Commerce Act, 49 U.S.C. § 5(2)(a) (1970), in relevant part provides:

"It shall be lawful, with the approval and authorization of the Commission, . . .

(i) for two or more carriers to consolidate or merge their properties or franchises, or any part thereof, into one corporation for the ownership, management, and operation of the properties theretofore in separate ownership; or for any carrier, or two or more carriers jointly, to purchase, lease, or contract to operate the properties, or any part thereof, of another; or for any carrier, or two or more carriers jointly, to acquire control of another through ownership of its stock or otherwise. . . ."

§ 210a(b) of the Interstate Commerce Act, 49 U.S.C. § 310a(b) (1970), in relevant part provides:

"Pending the determination of an application filed with the Commission for approval . . .

of a purchase, lease, or contract to operate the properties of one or more motor carriers, the Commission may, in its discretion, and without hearings or other proceedings, grant temporary approval . . . of the operation of the motor carrier properties sought to be acquired by the person proposing . . . to acquire such properties . . . if it shall appear that failure to grant such temporary approval may result in destruction of or injury to such motor carrier properties sought to be acquired, or to interfere substantially with their future usefulness in the performance of adequate and continuous service to the public."

**6.** In certifying the record to the Commission the ALJ observed:

"The statements and demeanor of all witnesses testifying at the hearing did not demonstrate any instance which would subject the credibility of such witnesses to question."

issued as a result of such prosecution . . . ."

Accordingly the Commission ordered that the application for permanent authority be dismissed and that the temporary authority be revoked.

The Commission also held that there were circumstances which justified revocation of the temporary authority independent of the dismissal of the permanent application for lack of prosecution. Referring to its finding that the trustee's Rexco operations were in willful violation of the law, the Commission concluded that "REA, as it now exists, is not fit to conduct proper and safe operations." This in turn was held to constitute good cause within the meaning of § 210a(a) of the Act for revocation of the temporary authority.

With respect to the cease and desist provisions of the Commission's order, the trustee immediately complied with them. He did not seek reconsideration of that part of the order or the findings of illegal operations upon which it was based. He does not challenge the cease and desist order provisions on the instant petition to review. With respect to the provisions of the Commission's order which dismissed the application for permanent Hub authority and revoked the temporary authority, the trustee did file a petition for rehearing. On January 27, 1977 the Commission entered an order adhering to its findings, report and order of November 17 and denied the various petitions and motions before it, including that of the trustee for rehearing referred to above.

The instant petition to review is addressed to the Commission's orders of November 17, 1976 and January 27, 1977. The jurisdiction of this Court is invoked under 28 U.S.C. § 2342(5) (Supp. V., 1975), *amending* 28 U.S.C. § 2343 (1970). On January 5, 1977 we stayed the Commission's order of November 17, 1976 pending judicial review and ordered an expedited briefing and argument schedule.

Essentially the trustee challenges the dismissal of its application for permanent Hub authority and the revocation of the temporary authority previously granted. Various intervenors support the positions of either the trustee or the Commission. For the reasons below we deny the petition to review and affirm the orders of the Commission.

## II. ICC RULE 247(f)

■ Critical underpinning for the Commission's dismissal of the trustee's application for permanent Hub authority is Rule 247(f) of the Commission's Rules of Practice, 49 C.F.R. § 1100.247(f) (1976), which in relevant part provides:

"An applicant who does not intend timely to prosecute its application, shall promptly request dismissal thereof. Failure to prosecute an application under procedures ordered by the Commission will result in dismissal thereof. . . ."

In the record of the Hub system proceeding the Commission found a basis for faulting REA for inaction under Rule 247(f). At a pre-hearing conference on January 12, 1970 REA represented that it would be prepared to present its operating evidence in April of that year. Thereafter REA requested no further action from the Commission. As the Commission found in its November 17, 1976 report however REA in applying for irregular route authority in 1971 "specifically expressed its intention to dismiss the Hub proceeding", and thereby "in effect . . . repudiated that approach. . . ."[7]

The Commission interpreted its Rule, which requires that an applicant who does not intend to prosecute *promptly* to request dismissal, as placing "some affirmative duty on an applicant to prosecute or seek dismissal." Since REA had permitted 8 years to pass without doing either—but indeed in its 1971 application affirmatively had dem-

---

7. The Commission also found that
 "REA would have failed much sooner had it not been for the forbearance of this Commission . . . in giving REA every possible leeway and not forcing it to go immediately to hearing on matters it was not in a position to prove."

onstrated its intent *not* to prosecute—the Commission concluded that dismissal was warranted under the Rule.[8] We agree. No citation of authority is needed for the elemental proposition that an administrative agency's interpretation of its own rule or regulation is entitled to great deference by the courts. We accord that deference to the ICC's interpretation here of its Rule 247(f).

### III. LACK OF SUBSTANTIAL EVIDENCE CLAIM

The trustee mounts a massive attack upon the Commission's interpretation of its own Rule 247(f) and argues that there is no substantial evidence in the record to support the Commission's dismissal for lack of prosecution of the trustee's application for permanent Hub authority. We disagree.

The trustee contends that all of the delay in the Hub proceeding after 1970 was attributable to procrastination on the part of the Commission. He says that REA stood ready to proceed after the January 1970 pre-hearing conference and made no representations to the contrary. Upon this premise he concludes that the failure to commence the hearing in April and to take any action whatsoever in the case for four years should be charged to the Commission.

The trustee seeks to buttress this conclusion with a letter dated August 23, 1974 by a Commission employee responding to a request for information regarding the Hub case. It states that due to the "unusual nature" of the proceeding no estimated "processing time" could be given. The trustee argues that this amounts to an admission of culpability on the part of the

Commission for the delay. He also relies upon an order entered sua sponte by the Commission on January 9, 1975 consolidating the Hub proceeding with several other pending REA applications. From this the trustee infers Commission recognition of the application's continuing "viability."

■ We have carefully considered these and other facts relied on by the trustee in support of his claim that the Commission's finding that REA did not intend timely to prosecute its application within the meaning of Rule 247(f) is not supported by substantial evidence. We are not persuaded by the trustee's claim. The events of 1970 at best are ambiguous aids in the task of allocating blame for the delay. Moreover they were stripped of whatever probative force they might otherwise have had when REA in 1971 disrupted the status quo in the Hub proceeding with its application for irregular route authority. After the 1970 delay, rather than returning and requesting that the Commission move along with the Hub proceeding, REA requested that the entire matter be dropped. That action, together with REA's subsequent silence for many years and its deteriorating financial condition, certainly permits, if it does not compel, the inference that REA had no intention of pursuing the Hub application to a conclusion.[9] The letter of 1974 and the order of 1975, viewed in the familiar context of an administrative proceeding, amount to nothing more than isolated routine administrative actions. They neither rebut the inference of REA's intent not to prosecute its application nor do they fix responsibility on the Commission for the delay.[10]

---

**8.** The Commission also noted that the fact of REA's bankruptcy and subsequent liquidation removed any need to excuse REA's conduct and to permit its application to remain pending because of the public interest or the National Transportation Policy. 54 Stat. 899 (1940).

**9.** The trustee, relying on REA's continuous operations under the Hub system until 1975, challenges as arbitrary and capricious the Commission's characterization of the 1971 application as a "repudiation" of the Hub concept. According to the trustee REA had no choice but to adhere to Hub.

This is beside the point. REA's statements of repudiation in the 1971 application are highly probative on the question of intent to prosecute the *permanent* application. An intent not to prosecute the permanent application could have been, and probably was, consistent with an intent to continue Hub operations under the temporary authority for an indefinite period.

**10.** Implicit in the trustee's argument that responsibility for pressing the Hub proceeding was that of the Commission is the notion that the Commission's inaction estops it from relying on its Rule 247(f). Aside from the highly

We hold on the record as a whole that there was substantial evidence to support the Commission's dismissal of the application on the ground that REA did not intend to prosecute its application within the meaning of Rule 247(f).

■ This does not end our inquiry with respect to the trustee's lack of substantial evidence claim. He also challenges the substantiality of the evidence from another angle. He suggests that the Commission's own decisions under Rule 247(f) limit dismissal for failure to prosecute to situations where the applicant has failed to comply with a procedural order of the Commission, citing *New Rochelle Moving & Storage— Contract Carrier Application*, 111 M.C.C. 418 (1970); *C. E. Carroll Common Carrier Application*, 3 M.C.C. 393 (1937); *Wellington Well Watkins Contract Carrier Application*, 2 M.C.C. 309 (1937); *Traffic Motor Express Common Carrier Application*, 1 M.C.C. 419 (1937). Since REA did not violate any Commission order, so the argument goes, stare decisis precludes application of Rule 247(f) under the circumstances of this case. Once again we disagree.

The cases on which the trustee relies were decided under the second sentence of Rule 247(f), see p. 947 *supra*, which deals explicitly with noncompliance with Commission orders. The issue here, to which the Commission opinion is addressed, involves the interpretation of the first sentence of Rule 247(f) which imposes a duty on the applicant to procure dismissal when it no longer intends to prosecute its application.

The Commission, whose interpretations of its own rules are entitled to great weight, reads the first two sentences of Rule 247(f) in the disjunctive. We cannot say that this interpretation is incorrect. Under the trustee's contrary construction the second sentence would modify the first and thereby effectively repeal it.[11] Furthermore, the first sentence, by providing a means to enable the Commission to correct abuses of its temporary authority procedure, functions in aid of the Act's overall regulatory scheme of temporary and permanent authorities.

We hold that a finding of noncompliance with an order of the Commission is not a prerequisite to dismissal of an application for failure to prosecute under Rule 247(f).

## IV. ABUSE OF DISCRETION CLAIM

■ We turn next to the trustee's principal challenge to the Commission's orders under review. The trustee asserts that the Commission abused its discretion in dismissing the Hub application under Rule 247(f) before acting on the pending Alltrans applications for transfer of REA's authorities pursuant to §§ 5(2)(a) and 210a(b) of the Act.

In its report and order of November 17, 1976 and in its order of January 27, 1977 the Commission expressly and in detail took into account the pending Alltrans applications, as well as the claims of Alltrans as an intervenor in the instant proceedings. In acting first on the REA application, however, we believe that the Commission acted well within its discretion. In short, we

dubious proposition that a government agency may be equitably estopped, see *Mitchell Bros. Truck Lines v. United States*, 225 F.Supp. 755 (D.Ore.1963) (three-judge court), aff'd, 378 U.S. 125 (1964) (per curiam); *Sims Motor Transport Lines, Inc. v. United States*, 183 F.Supp. 113, 119 (N.D.Ill.1959) (three-judge court), clearly there is no basis whatsoever for suggesting anything even akin to estoppel on the part of the Commission here. There was no representation by the Commission upon which REA justifiably could have relied. Far from suffering any detriment from the continued pendency of the application, REA reaped the benefit of undisturbed continued operation of the temporary authority for many years.

In any event the trustee cites no authority for the proposition that the responsibility for pressing the Hub application was on the Commission. Rule 247(f) is the only authority in point. We agree with the Commission that under that Rule the responsibility for pressing the application is on the applicant.

11. We note that unlike the second sentence the first does not provide explicitly for dismissal at the instance of the Commission. The Commission however obviously was entitled to infer such power. Otherwise it would lack any means of enforcing the first sentence. Cf. *Link v. Wabash R. Co.*, 370 U.S. 626 (1962) (inherent power of federal court to dismiss sua sponte for failure to prosecute).

agree with the Commission's conclusion set forth in its January 27, 1977 order that "in these circumstances, the disposition [of the REA application for permanent Hub authority] properly preceded disposition of the applications of Alltrans noted above".

The crux of the Commission's decision of November 17, 1976 in dismissing REA's application for permanent Hub authority was its recognition of "the probability that a bankrupt *and* liquidated carrier will not and cannot prosecute its outstanding applications." (emphasis that of the Commission). In support of its revocation of REA's temporary authority the Commission noted that REA "as it now exists, is not fit to conduct proper and safe operations." These findings clearly support the Commission's conclusion that "dismissal of this application will not be inconsistent with the public interest, the public convenience and necessity, or the National Transportation Policy . . . ."

The trustee urges that the Alltrans applications were relevant to these findings and conclusions of the Commission. He argues that absent an adjudication of the Alltrans applications there is an inadequate factual basis in the record for the Commission's conclusions that the REA application would not be prosecuted, that REA was unfit, and that dismissal of that application would have no adverse impact on the public interest and the National Transportation Policy. Accordingly the trustee invites us to hold that the Commission's decision that disposition of the REA application properly preceded disposition of the applications of Alltrans constituted an abuse of discretion and was arbitrary and capricious within the meaning of § 10(e)(2)(A) of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) (1970).[12] We decline the invitation.

In doing so however we have carefully weighed the competing considerations. In its decision in the instant case the Commission recognized that dismissal of the Hub application must not be "inconsistent with the public interest, the public convenience and necessity, or the National Transportation Policy. . . ." The existence of a fit and willing substitute applicant, under appropriate circumstances, might be said to have a direct bearing on the inquiry. We also are mindful that, since an application or temporary authority which has ceased to exist cannot be transferred, the decision against the trustee here as a practical matter forecloses further consideration of Alltrans' applications for transfer.

■ On the other hand docket management is a discretionary matter as to which courts virtually never substitute their judgment for that of an administrative agency. E. g., *FCC v. WJR*, 337 U.S. 265, 272 (1949); *Peninsula Corp. of Seaford, Delaware v. United States*, 60 F.Supp. 174 (D.D.C.1945) (three-judge court). Having said this, we recognize the exceptional situation where two mutually exclusive, bona fide applications should be considered together. See *Ashbacker Radio Corp. v. FCC*, 326 U.S. 327 (1946). And we further recognize more broadly that in an appropriate case considerations of administrative convenience, expedition and fairness may come down so strongly on the side of consolidated consideration of interrelated questions that failure to consolidate would amount to an abuse of discretion. See *A. L. Mechling Barge Lines, Inc. v. United States*, 376 U.S. 375, 382–86 (1964).

With these principles in mind we turn to the instant case to determine whether the Commission was justified in declining in effect to permit Alltrans to stand in the shoes of REA. The Commission gave two

12. Alltrans as intervenor supports the trustee's position that the Commission should not have dismissed the Hub application without first considering the Alltrans applications. It argues that "orderly administrative process" required this because "if the Alltrans' application[s] had been processed . . . the matters now before this Court *would be rendered* *moot.*" (emphasis that of Alltrans' counsel). As authority for this argument Alltrans relies on the broad provisions of § 17(3) of the Act, 49 U.S.C. § 17(3) (1970), which provides that the Commission's proceedings shall be conducted "in such manner as will best conduce to the proper dispatch of business and to the ends of justice. . . ."

reasons for its action. First, such substitution would have permitted REA to " 'transfer away' redress for its breaches of the Act and this Commission's rules and regulations . . . ." Second, "if there is, in fact, [the] need for a nationwide general express service" which Alltrans claims, § 210a(a) provides "a means by which [such] immediate and urgent need for . . . service can be satisfied by willing carriers." In other words, a new application for temporary authority would provide an adequate remedy to Alltrans if shown to be in the public interest.

We find the Commission's explanation persuasive—especially when § 210a(a) and Rule 247(f) are viewed in the context of the Act's overall regulatory scheme.

 The Act reflects the determination of Congress that regulation of competition among carriers is necessary in the public interest. As one part of its regulatory pattern, the Act protects the motor carrier industry from overcompetition and preserves standards of safety and financial responsibility within the industry by regulating entry. Under §§ 205–209 of the Act, 49 U.S.C. §§ 305–309 (1970), entry ordinarily may be authorized by the Commission only after full adversary proceedings. See *American Form Lines v. Black Ball Freight Service*, 397 U.S. 532, 543–44 (1970) (Brennan, *J.*, dissenting). The temporary authority provided in § 210a(a) is a strictly limited exception to this regulatory pattern. It was designed to provide the Commission with a swift and procedurally simple means of responding to urgent transportation needs. *Id.* at 539 (majority opinion). Temporary authority is in the nature of preliminary relief. It necessarily is granted without a thorough investigation into the public need, the carrier's fitness, or the interests of competing carriers. E. g., *Mobile Home Express, Ltd. v. United States*, 354 F.Supp. 701, 706 (W.D.Okl.1973) (three-judge court); *HC&D Moving and Storage Co. v. United States*, 317 F.Supp. 881 (D.Haw.1970) (three-judge court) (per curiam).[13]

In the instant case the temporary authority had been in existence for 8 years. REA had continued operations under it in violation of Rule 247(f). In refusing to permit Alltrans to stand in the shoes of REA, the Commission was enforcing orderly utilization of its regulatory procedures. If the Commission were held to lack discretion to prohibit renewal of temporary authorities subject to dismissal for violation of Rule 247(f), the limited function of § 210a(a) would be subverted. Carriers could acquire and misuse temporary authorities secure in the belief that such authorities could be put on the market if the Commission or their competitors proceeded against them.

 In *Gilbertville Trucking Co. v. United States*, 371 U.S. 115 (1962), the Supreme Court relied on a similar deterrent rationale in sustaining the Commission's disapproval of a merger under § 5(2) of the Act on the ground that the two carriers had violated the control provisions of § 5(4) prior to their merger application.[14] We think that the Court's view of the impact of

---

13. The courts have given the Commission broad discretion in making § 210a(a) determinations. *E. g., Garnett Freight Lines, Inc. v. United States*, 540 F.2d 450 (9 Cir. 1976) (per curiam); *Land-Air Delivery, Inc. v. United States*, 371 F.Supp. 217 (D.Kan.1973) (three-judge court); *Schenley Distillers Corp. v. United States*, 50 F.Supp. 491, 496 (D.Del.1943) (three-judge court).

14. For the relevant parts of § 5(2) of the Interstate Commerce Act, 49 U.S.C. § 5(2) (1970), see note 5, *supra*.

§ 5(4) of the Interstate Commerce Act, 49 U.S.C. § 5(4) (1970), in relevant part provides: "It shall be unlawful for any person, except as provided in paragraph (2) of this section, to enter into any transaction within the scope of subdivision (a) of paragraph (2) of this section, or to accomplish or effectuate, or to participate in accomplishing or effectuating, the control or management in a common interest of any two or more carriers, however such result is attained, whether directly or indirectly, by use of common directors, officers, or stockholders, a holding or investment company or companies, a voting trust or trusts, or in any other manner whatsoever. It shall be unlawful to continue to maintain control or management accomplished or effectuated after the enactment of this amendatory paragraph and in violation of its provisions. . . ."

the § 5(4) violation in *Gilbertville* is equally applicable to the Rule 247(f) violation here:

> "[E]ven an automatic rule is not necessarily arbitrary. . . . § 5(4) is integral to the success of the regulatory scheme. To approve a merger in the face of a § 5(4) violation may encourage others whose merger may not be consistent with the public interest to either present the Commission with a *fait accompli* or avoid its jurisdiction altogether. . . . [I]f such practices were encouraged, [the Commission's] 'administration of the statute in the public interest would be seriously hindered if not defeated'. . . ." *Id.* at 128.

See also *Lombard Bros. Inc. v. United States*, 226 F.Supp. 905, 908 (D.Conn.1964) (three-judge court) (Swan, *J.*).

Under *Gilbertville* however the Commission's interest in enforcing compliance with the Act in some circumstances may be outweighed by the public interest in granting the application. 371 U.S. at 129. The trustee urges here that the Commission only peripherally considered the public interest, preferring to relegate Alltrans to a new application under § 210a(a).

We are satisfied however upon a close comparison of the provisions of §§ 210a(a) and 210a(b), see notes 3 and 5 *supra*, that under the circumstances of this case the Commission acted well within its discretion. Under § 210a(a) existing service is *not* presumed and the applicant must show an "immediate and urgent need" for service. On the other hand, § 210a(b), under which the Alltrans transfer applications would proceed, provides for temporary authority pending approval of a merger or a transfer of authorities. Since an authority already exists in a § 210a(b) case, basic public need for the service in question *is* presumed; the critical question in such a case is whether an interim interruption in service will injure or destroy the properties to be transferred or "interfere substantially with their future usefulness in the performance of adequate and continuous service to the public."

In the instant case the Commission did make certain findings which bear on the § 210a(b) question referred to above.[15] It is arguable however that the Commission's findings did not conclusively show that the proposed transfer to Alltrans and continuation of Hub service was against the public interest. But the procedure proposed by Alltrans also would fail to result in an adjudication of the question of public interest in the transfer and continuation. The inquiry under § 210a(b) is not intended to go that far. The section presumes that the full adversary hearings on the issue of public convenience and necessity which the Hub authority never has undergone already have occurred. For its public interest anchor therefore Alltrans would have to fall back on the Commission's summary 1968 finding of "immediate and urgent need." The record in this case however provides ample justification for the Commission's refusal to presume the continued existence of the conditions which warranted its action in 1968.

We hold that the Commission did not abuse its discretion in dismissing the Hub application under Rule 247(f) without considering on their merits the Alltrans transfer applications. REA's violation of Rule 247(f) gave rise to a substantial enforcement interest. The circumstances of REA's collapse and the complete cessation of actual service under the Hub authority for one year preceding the decision in this case amply justified the Commission in requiring a minimal showing of public interest under § 210a(a) as a prerequisite to Alltrans' resumption of Hub services pending adjudica-

---

15. For example it found that other carriers had expanded to fill the void left by REA. Obviously this finding is correct and is supported by the record. The difficulty is that it is not a complete answer to the question of public interest in continued Hub operations. Doubtless some expansion has occurred. But the proceedings before the Commission were not directed to the determination of the precise extent of such expansion and the concomitant question of the extent of the need for renewed express service.

tion of the application for permanent authority.[16]

■■■■ This holding necessarily disposes of the trustee's final contention—that he should have been held to the lesser burden of proof of § 210a(b). This case presented the Commission with questions of first impression regarding §§ 210a(a) and 210a(b). There is no rule that requires the Commission to apply the provisions of § 210a(b) to parties who seek to transfer temporary authority no matter what the circumstances. Such a rule would permit temporary authority to become a functional substitute for permanent authority and would distort the statutory scheme. The Commission moreover has a continuing duty to reopen and reconsider its decisions regarding temporary authorities. *Braswell Motor Freight, Inc. v. United States*, 336 F.Supp. 709, 712 (C.D.Cal.1971) (three-judge court). The Commission did not abuse its discretion in doing so here in the context of a proceeding which sought dismissal under Rule 247(f) of an application for permanent authority.

The trustee relies on *Eagle Motor Lines, Inc. v. ICC*, 545 F.2d 1015 (5 Cir. 1977), for the proposition that the shift in the burden of proof makes a fresh application an inadequate remedy for improper summary revocation of operating authority. Suffice it to say that that case arose under entirely different circumstances, under a different section of the Act and is wholly unpersuasive here.

■■■■ Temporary authority can exist only pursuant to a pending application for permanent authority. Accordingly the Commission's dismissal of the Hub application for permanent authority constituted "good cause" under § 210a(a) for revocation of the

Hub temporary authority. Since we affirm the Commission's dismissal under Rule 247(f), we find it neither necessary nor appropriate to reach the trustee's objections to the Commission's independent grounds for revocation of the temporary authority.

We have carefully considered all of the claims of the trustee, as well as those of the intervenors who support the trustee, and we find them without merit.

We vacate our stay of January 5, 1977 and order that the mandate issue forthwith.

Petition denied; orders affirmed.

---

16. Intervenor Brotherhood of Railway and Airline Clerks (BRAC) contends that the Commission's orders violate the National Transportation Policy because the Commission failed to "collect facts" about employee interests. This contention is without merit. The Commission obviously was aware of the unemployed status of REA's employees. BRAC fails to suggest any material facts which further inquiry might have developed. Moreover the National Trans-

portation Policy is not directly concerned with the problems of unemployment and creditors' rights. Cf. *Luckenbach S.S. Co. v. United States*, 122 F.Supp. 824 (S.D.N.Y.) (three-judge court) (A. Hand, *J.*), *aff'd*, 347 U.S. 984 (1954) (per curiam).

*Schaffer Transportation Co. v. United States*, 355 U.S. 82 (1957), on which BRAC relies, is wholly irrelevant.