558 F.2d 1127
 In the Matter of REA HOLDING CORPORATION, the Express
Company, REA Express, Inc., f/k/a Railway Express
Agency, Inc., Rexco Supply Corporation,
Bankrupts.
Matthew E. MANNING, Anthony Satriano, Daniel S. Gilhuly,
Vincent Pontillo, William R. Wegl, Edmund F.
Novitski, Edward J. Cox, Anthony J.
Januzzi, Charles
F. McGovern and James J. Kilcoyne, Creditors-Appellants,
Brotherhood of Railway, Airline and Steamship
Clerks, Freight Handlers, Express and
Station Employees, Intervenor,
v.
C. Orvis SOWERWINE, Trustee in Bankruptcy, Appellee.
 No. 789, Docket 76-5039.
 United States Court of Appeals,
Second Circuit.
 Argued April 14, 1977.
Decided July 27, 1977.
 
 Arthur M. Wisehart, New York City (Wisehart, Friou & Koch, New York City, of counsel), for creditors-appellants.
 William M. Kahn, and Joshua J. Angel, New York City (Whitman & Ranson, Marcus & Angel, New York City, co-counsel, Donald L. Wallace, Jeffrey A. Oppenheim, New York City, of counsel), for appellee.
 John O'B. Clarke, Jr., Washington, D. C. (Reilly, Fleming & Reilly, New York City, and Highsaw, Mahoney & Friedman, Washington, D. C., on the brief; David J. Fleming, New York City, James L. Highsaw, Washington, D. C., William J. Donlon, Gen. Counsel for Brotherhood of Railway and Airline Clerks, Rosemont, Ill., of counsel), for intervenor.
 Before CLARK, Associate Justice,* and MOORE and MULLIGAN, Circuit Judges.
 MOORE, Circuit Judge:
 
 
 1
 Four companies, REA Holding Corporation, The Express Company, Inc., REA Express, Inc., f/k/a Railway Express Agency, Inc. and Rexco Supply Corporation (collectively referred to as "REA"), have been adjudicated as bankrupts. Out of the welter of charges and countercharges a few salient facts emerge. For many years prior to 1975 REA had been engaged in the express shipping business in the United States by land and by air, and to some extent internationally. Its Railway Express Agency trucks were a common sight to the American public. It operated under both Interstate Commerce Commission (ICC) and Civil Aeronautics Board (CAB) authority.
 
 
 2
 Unlike the Biblical seven fat years alternating with seven lean years,[1] for some 30 years REA's were all lean with a modest exception in 1974. The natural consequence of such financial debility was the filing of a petition for an arrangement under Chapter XI of the Bankruptcy Act, 11 U.S.C. § 701 et seq., which occurred on February 18, 1975. Honorable John J. Galgay, the Bankruptcy Judge in charge of these proceedings, by order permitted the Bankrupts to continue to operate their business as Debtors-In-Possession. A Creditors Committee (confirmed April, 1975), in cooperation with the Bankrupts, endeavored by operating economies to restore REA to a profitable operation. One of the economy measures was a motion to reject a contract with the Brotherhood of Railway and Airline Clerks (BRAC), a union of which most employees were members. From the time of the motion until ultimate rejection of the contract, the BRAC employees were paid only 90% of their then going wage and no vacation or holiday pay. These deficits constitute the bulk of the large claims which the BRAC employees assert and are the source of the claims of the ten petitioning creditors in this proceeding.
 
 
 3
 Despite high hopes and substantial economies, REA continued to suffer losses which during the Chapter XI proceeding February 18, 1975 through September 28, 1975 amounted to some $15,790,000 with a discouraging prognostication of additional losses of some $5,681,000 for the next three months (October through December).
 
 
 4
 Unable to meet their payrolls, the Bankrupts on November 6, 1975 requested that they be adjudicated bankrupt. Then ensued rapid developments. On November 6, 1975 the bankruptcy order was signed and entered. The next day, C. Orvis Sowerwine, Esq. was appointed and qualified as Trustee. The Trustee straightaway proceeded to collect claims and to liquidate the bankrupts' assets including terminals and rolling stock so that REA had no operating facilities. There remains, however, REA's "operating authorities" rights obtained through the ICC and CAB to operate various routes.
 
 
 5
 In the liquidation process, these operating authorities were put up for sale. Six hearings were held before the Bankruptcy Judge during the period from June 23, 1976 to July 9, 1976. Judge Galgay, in an opinion and order dated July 16, 1976, held that of the four[2] proposals submitted for the acquisition of REA's operating authorities, customer lists and trade names and marks, the Alltrans Express U.S.A. proposal was the "best offer": that it represented "a fair and reasonable value for the Property"; that "acceptance of the Alltrans offer is in the best interests of the bankrupt estate"; and that it "provides the probability of the greatest realization to the bankrupt estate from the sale of the property".
 
 
 6
 The Bankruptcy Judge had eliminated All Truck and ABC as submitting either partial or contingent offers, so that the choice was between Alltrans and REAEMCO. In the July 16, 1976 order, the Judge found in favor of Alltrans and directed the Trustee to accept the Alltrans offer and to prepare a contract for submission to, and approval by, the Judge. An appeal from this order is pending before Judge Werker.
 
 
 7
 Although not particularly material to the narrow issue before us, a word about Alltrans and REAEMCO may not be amiss.
 
 
 8
 Alltrans is represented to be a subsidiary of Thomas Nationwide Transport, Ltd., with consolidated assets of $190,000,000. Pursuant to its proposal, Alltrans was to pay the Bankrupts $2,500,000 in cash upon ICC approval of a temporary transfer to it of the operating authorities. Additionally, pending decision on a permanent transfer, Alltrans would make interim payments of certain percentages of gross revenues over a ten year period. If such approval of a permanent transfer were obtained, Alltrans and Thomas together guaranteed payments of at least some $9,500,000.
 
 
 9
 REAEMCO was organized in the interest of REA's employees who desired to continue to operate REA. It was without funds and without operating facilities. Its chief asset was "hope" and a hypothetical plan portrayed in minute detail during 31/2 days of testimony by an acknowledged expert in the transportation field, Mr. F. Ralph Nogg. It was Mr. Nogg's opinion that $3,000,000 would be needed at the outset; that equipment could be rented or purchased by the employees; that employees could contribute 10% of their salaries; and that large anticipated profits might enable substantial payments to be made to creditors. However, no part of the REAEMCO plan called for the production and presentation of new money because there was none.
 
 
 10
 Thereafter, a group of ten former REA employees, as creditors (claims aggregating $22,000) filed a petition for reorganization under Chapter X of the Bankruptcy Act, 11 U.S.C. § 501 et seq. That petition, assigned to District Judge Lloyd F. MacMahon, was referred to Bankruptcy Judge Galgay who since February 18, 1975 had been thoroughly familiar with all the facts and proceedings in connection with the bankrupt estate. Judge Galgay held a hearing on the petition on September 27, 1976. It is on that occasion that appellants claim that they were deprived of a fair hearing. The deprivation, however, is that Mr. Nogg was not permitted to repeat his contention that "the reorganization of REA would be feasible". (Appellants' Brief, p. 13a). But the Bankruptcy Judge considered all of the testimony and exhibits from November 5, 1975 to September 27, 1976, including all of the Nogg testimony in support of feasibility. The only issue before the Judge and before us is whether the Chapter X petition was filed in good faith.
 
 The Bankruptcy Act provides:
 
 11
 "Without limiting the generality of the meaning of the term 'good faith', a petition shall be deemed not to be filed in good faith if * * *
 
 
 12
 (3) It is unreasonable to expect that a plan of reorganization can be effected . . . ." 11 U.S.C. § 546.
 
 
 13
 Thus the Bankruptcy Judge did not have to look behind the petition to discover an improper or unethical purpose. He only had to look at the petition against the background of all the facts known to him and decide whether it was "reasonable to expect that a plan of reorganization can be effected." To this end, he not only had opinion testimony before him, but the actual experience of a debtor using substantial economy measures and accumulating a $15,790,000 deficit in seven and a half months and a further estimated deficit of $5,681,000 in three additional months. He knew that there were no terminals, no operating equipment and no operating personnel; even the operating authorities were in jeopardy. The period taken for decision was short, but he was entitled to rely on a non-legal concept "deja vu".
 
 
 14
 The Bankruptcy Judge's Report of September 28, 1976 was submitted to Judge MacMahon who, on September 30, 1976, after oral argument from the parties on September 29, 1976, found the Bankruptcy Judge's findings supported by substantial evidence and adopted them in all respects. Judge MacMahon was mindful that "more time might improve the fullness of this (his) memorandum", but wisely refrained from adding to the volumes which already overtax the space of our law libraries and held that the petition was not filed in good faith. This holding is clearly correct on the facts and the law, 11 U.S.C. § 546(3), and we therefore affirm.
 
 
 15
 Appellant argues in extenso (it may be said in extensissimo ) that the bankruptcy proceedings have been tainted by a conflict of interest on the part of the Trustee. This is no occasion to do more than touch upon the subject which seems to be an obsession of the appellants. In the first place, it is completely irrelevant to the issue of the likelihood of a feasible reorganization. This decision is solely for the Bankruptcy Judge and the court. The recommendation by the Trustee that the Alltrans offer should be accepted was quite in accord with the facts Alltrans offered reality; REAEMCO offered unfulfilled, speculative hopes. Nor did the Bankruptcy Judge follow the Trustee's recommendation blindly, as his report clearly shows. Conflict of interest did not create the unfortunate financial situation in which REA found itself. Conflict of interest did not create the facts which after full and fair exploration proved the Alltrans offer to be superior.
 
 
 16
 The appeal from the July 16, 1976 order (acceptance of Alltrans offer) is pending. Proceedings before the ICC are unfinished. There are still problems for the Bankruptcy Judge and on the facts, there is no need for a receiver. Appellants are still free to raise the issue of conflict of interest in appropriate proceedings in which facts, if any, may be adduced in support thereof. Conflict of interest is a conclusion and conclusions should rest upon a solid foundation of fact. The order dismissing the Chapter X petition and vacating the stay was proper and accordingly we affirm.
 
 
 
 *
 Honorable Tom C. Clark, Associate Justice, United States Supreme Court, Retired, sitting by designation
 Mr. Justice Clark died on June 13, 1977, before this case could be decided. Pursuant to § 0.14 of the Rules of this Court, this petition is being determined by Judges Moore and Mulligan, who are in agreement. Prior to his untimely death, Mr. Justice Clark had voted to affirm the petition.
 
 
 [1]
 Genesis, Chap. 41
 
 
 [2]
 Alltrans Express U.S.A. ("Alltrans"), REAEMCO, Inc., All Truck Express, Inc. ("All Truck") and ABC Freight Forwarding Corporation ("ABC")