REAEMCO, INC., Plaintiff,

v.

ALLEGHENY AIRLINES, American Airlines, Burlington Northern Inc., Delta Airlines, Eastern Airlines, Northwest Airlines, Penn Central Railroad, Shearson Hayden Stone Inc. and Trans World Airlines, Defendants.

No. 78 Civ. 6075.

United States District Court, S. D. New York.

July 28, 1980.

548

Mordecai Rosenfeld, New York City, for plaintiff.

Chadbourne, Parke, Whiteside & Wolff, New York City, for defendants, Allegheny Airlines, Inc., American Airlines, Inc., Delta Airlines, Inc., Eastern Airlines, Inc., Northwest Airlines, Inc. and Trans World Airlines, Inc.; Zachary Shimer and Edwin D. Scott, New York City, of counsel.

Rogers & Wells, New York City, for defendant Burlington Northern, Inc.; William R. Glendon and Guy C. Quinlan, New York City, of counsel.

Donovan, Leisure, Newton & Irvine, New York City, for defendant Penn Central Corp.; Kenneth N. Hart, Kenneth E. Newman, and James C. Sherwood, New York City, of counsel.

Willkie, Farr & Gallagher, New York City, for defendant Shearson Hayden Stone Inc.; William T. Sullivan, and Richard E. O'Connell, New York City, of counsel.

## OPINION

ROBERT L. CARTER, District Judge.

■ Plaintiff Reaemco, Inc. seeks treble damages under section 4 of the Clayton Act, 15 U.S.C. § 15, for defendants' alleged violations of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. Reaemco also alleges violations of the Interstate Commerce Act, 49 U.S.C. § 5, and seeks damages thereunder, 49 U.S.C. § 8.[1] Pursuant to Rule 12(b)(6), F.R.Civ.P., all defendants have moved to dismiss the complaint for failure to state a claim upon which relief can be granted.[2] Defendants assert three main grounds for dismissal: plaintiff lacks standing to assert antitrust claims; the charges based on defendants' alleged actions to influence government action fail to state a claim under the antitrust laws; and the collateral estoppel or *res judicata* effect of prior proceedings. In addition, defendants assert that the Interstate Commerce Act claim is not viable and is barred by the applicable statute of limitations.

### I

*Facts*

This case arises out of the failures of four related companies (hereinafter referred to collectively as "REA"): REA Holding Com-

---

1. Public Law 95 473, Oct. 17, 1978, revised and recodified the Interstate Commerce Act, and all of its sections were renumbered. Former section 5 is now found, in relevant part, at 49 U.S.C. § 11342; former section 8 at 49 U.S.C. § 11705(b)(2), (d)(3). However, because the parties have referred to the former numerations, the old section numbers are retained for the sake of convenience.

   Reaemco also alleges violations of 28 U.S.C. § 959, which provides for private suits against court–appointed trustees, and of the common law and the "laws of the State of New York." Complaint ‘‘ 1(b), 10(c). These allegations are entirely conclusory, however. The complaint gives no hint as to how section 959 was violated nor suggests any injury to Reaemco from such violation; neither are any infractions of New York or common law ever spelled out. Even when viewed "in the light most favorable to plaintiff, and with every doubt resolved in his behalf," 5 C. Wright & A. Miller, *Federal Practice & Procedure* § 1357 at 601 (1969) (footnotes omitted), and accepting the truth of all of plaintiff's well–pleaded allegations, *Miree v. DeKalb County*, 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 2492, n. 2, 53 L.Ed.2d 557 (1977), the complaint does not state a valid claim for relief under 28 U.S.C. § 959 or state law, and these claims therefore must be dismissed without prejudice. F.R.Civ.P. 12(b)(6). *See Thurston v. Setab Computer Institute*, 48 F.R.D. 134, 135 (S.D.N.Y.1969) (Tenney, J.).

2. Reaemco has consented to the dismissal of defendant Penn Central, due to the unique complicating circumstances arising from the ongoing Penn Central reorganization. Penn Central seeks an award of costs in connection with its motion to dismiss, contending that Reaemco should not have named Penn Central a defendant in the first place in light of these circumstances. Reaemco does not concede that its claim against Penn Central lacks merit, however, but only that issues arising from Penn Central's internal difficulties "appear to complicate this antitrust case unnecessarily," and contends that an award of costs is inappropriate in this situation.

   Penn Central has been put to expense and inconvenience equal to that of the other defendants up to this point, because Reaemco consented to its dismissal only after reading Penn Central's memorandum in support of its motion to dismiss. *See Germain v. Semco Service Machine Co., Inc.*, 79 F.R.D. 85, 86–87 (E.D.N.Y.1978). Moreover, Penn Central is legally entitled to dismissal of the complaint on the grounds urged in its motion, and the fact that the complaint was brought in good faith is not by itself grounds for denying costs to a prevailing party. *Electronic Specialty Co. v. International Controls Corp.*, 47 F.R.D. 158, 160 (S.D.N.Y.1969) (Lasker, J.). Thus, although the result might have been otherwise had Reaemco consented to Penn Central's dismissal before the latter filed its motion, in the present situation Penn Central is entitled to recover its costs in defending this action. Rules 41(a), 54(d), F.R.Civ.P.; *see Germain v. Semco Service Machine Co., Inc., supra*; *Gammino Construction Co. v. Great American Insurance Co.*, 52 F.R.D. 323, 326 (D.R.I.1971); 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2366 at 177 (1971).

pany, the Express Company, Inc., REA Express, Inc. (formerly known as Railway Express Agency, Inc.), and Rexco Supply Corporation. On February 18, 1975, these companies filed a petition for an arrangement under Chapter XI of the former Bankruptcy Act, 52 Stat. 905 *et seq.* (1938) (repealed by Bankruptcy Reform Act of 1978, Pub.L. 95–598, Title I, § 101, 92 Stat. 2549 (1978)), and were permitted by the Bankruptcy Court, Galgay, J., to continue to operate as debtors–in–possession. In April, 1975, a creditors' committee which included defendants Allegheny Airlines, American Airlines, Delta Airlines, Eastern Airlines, Northwest Airlines, Trans World Airlines (hereinafter referred to collectively as the "airline defendants"), and Penn Central Railroad, was elected pursuant to section 338 of the former Bankruptcy Act. Defendant Burlington Northern, although not itself elected to the creditors' committee, was a creditor and allegedly nominated and voted for the seven defendants that were so elected.

In November, 1975, REA requested that it be adjudicated bankrupt; that request was granted by Judge Galgay on November 5, 1975. C. Orvis Sowerwine, an officer of defendant Shearson Hayden Stone Inc., was qualified as trustee, and the creditors' committee was dissolved. The trustee promptly proceeded to liquidate the bankrupts' operating facilities, so that the only substantial assets remaining were customer lists, trade names, trademarks and various "operating authorities" obtained through the Interstate Commerce Commission (ICC) and the Civil Aeronautics Board (CAB), necessary to the operation of their former business. *See In re REA Holding Corp. (Manning v. Sowerwine)*, 558 F.2d 1127, 1128–29 (2d Cir. 1977) ("*Manning.*").

One of the operating authorities formerly used by the bankrupt companies had already been lost. In 1975, the CAB ordered termination of REA's "air express" authority, *Express Service Investigation*, Docket No. 22388 (CAB April 9, 1975 and May 23, 1975), finding that continued air express service "was no longer in the public interest." *REA Express, Inc. v. C.A.B.*, 524 F.2d 54, 59 (2d Cir. 1975), *cert. denied*, 426 U.S. 906, 96 S.Ct. 2227, 48 L.Ed.2d 831 (1976). That order was affirmed by the Court of Appeals. *Ibid.*

Reaemco was incorporated in Delaware on April 30, 1976, "for the specific purpose of succeeding, as a common carrier, to the business and operating rights" of REA. Complaint ¶ 2(a). It was "organized in the interest of REA's employees who desired to continue to operate REA," *Manning, supra,* 558 F.2d at 1129, and 52% of its stock is held through a trust for the benefit of former REA employees. The complaint does not indicate that Reaemco ever engaged in any activities other than its attempts to purchase the remnants of REA, or that it had any facilities or ability to do so.

Between June 23, and July 9, 1976, Judge Galgay conducted six days of hearings to consider various proposals to purchase REA's remaining assets. The principal bidders were Reaemco and a company called Alltrans. On July 26, 1976, Judge Galgay directed the trustee to accept Alltrans' bid and reject Reaemco's. *In re REA Express, Inc.*, 75 B 253 (S.D.N.Y.). Reaemco's appeal from that order was denied. *In re REA Holding Corp.*, 447 F.Supp. 167 (S.D.N.Y. 1978) (Werker, J.). Plaintiff alleges that Alltrans' proposed purchase subsequently was rejected by the ICC (Complaint ¶ 8(f)), possibly in reference to the ICC's revocation of certain of REA's temporary operating authorities in late 1976. *See REA Express, Inc. v. United States*, 568 F.2d 940 (2d Cir. 1977), *cert. denied*, 435 U.S. 923, 98 S.Ct. 1485, 55 L.Ed.2d 516 (1978).

After Judge Galgay rejected Reaemco's proposal, ten former REA employees, as creditors, filed a petition for reorganization under Chapter X of the former Bankruptcy Act, 52 Stat. 883 *et seq.* (1938). Judge Galgay rejected the petition on September 28, 1976, *In re REA Express, Inc.*, 75 B 253 (S.D.N.Y.), and his report was adopted on appeal, *In re REA Holding Corp.*, 75 B 251 (S.D.N.Y. September 30, 1976) (MacMahon, J.), and subsequently affirmed by the Court of Appeals. *Manning, supra,* 558 F.2d 1127.

*The complaint*

Reaemco, painting with a broad brush, alleges a wide–ranging "unofficial agreement" among defendants amounting to a conspiracy in restraint of trade and an attempt to monopolize. The purported objects of this agreement were the final ruin of REA, its total elimination as a competitor in the express business, and the prevention of Reaemco from ever becoming a viable competitor in that area. The alleged motivation for Penn Central, Burlington Northern and the airline defendants was the desire to keep competition with their own express business operations at a minimum level. Shearson is alleged to have had several independent objectives: to assist its railroad and airline clients to minimize competition, to avert a substantial loss of business it might suffer if REA was successful in its law suits against various of its airline and railroad clients, and to control funds realized on REA's liquidation, which would have been unavailable in the event of a successful reorganization.

Defendants' alleged actions to effect these ends—the alleged offenses—and the injuries purportedly resulting therefrom fall into several general categories. The largest group consists of acts apparently directed at REA: defendants are accused of (1) preventing REA from being reorganized under Chapter X (Complaint ¶¶ 8(a), (f); (2) operating REA through Sowerwine and the creditors' committee so as to cause it further loss of assets and value (Complaint ¶¶ 8(b), (e), (i)); (3) thwarting the prosecution of REA's lawsuits against various airlines and railroads, and refusing to allow Reaemco to pursue them on REA's behalf (Complaint ¶ 8(c)); (4) using their monopoly power to control the terms on which vital services were provided to REA (Complaint ¶ 8(g)(i)); (5) filing false and excessive claims against REA in bankruptcy (Complaint ¶ 8(g)(ii)); and (6) engaging in improper activities "with respect to" the CAB to cause REA to lose its air express authority (Complaint ¶ 8(g)(iii)). Some of this conduct is claimed to have been undertaken in order to frustrate Reaemco's efforts to succeed to REA's business, but none is alleged to have been directed principally at Reaemco itself.

A second category alleges actions that were taken more or less directly against Reaemco. The complaint accuses defendants of (1) acting to render Reaemco's plan infeasible by campaigning to prevent Reaemco from obtaining the federal loans needed to effectuate it (Complaint ¶ 8(d)); (2) approving the aborted sale to Alltrans, knowing it would not be consummated, to block Reaemco's attempted purchase (Complaint ¶ 8(f)); and (3) harassing Reaemco by the use of administrative and judicial proceedings to foreclose Reaemco from access to such proceedings (Complaint ¶ 8(h)). Reaemco asserts that, as a result of defendants' conduct, it was injured by its inability to succeed to REA's business and operating authorities (Complaint ¶ 9). Actual damages are claimed in the amount of $55 million.

In addition to the injuries to REA and Reaemco said to flow from defendants' activities, a third class of injuries is claimed: defendants, by destroying REA and preventing Reaemco from succeeding to its business, allegedly caused REA's former employees to suffer losses, and Reaemco claims to be the "only vehicle" through which these losses may be recovered (Complaint ¶ 8(j)).

*Defendants' arguments*

Defendants' principal argument is that Reaemco lacks standing to assert these antitrust claims. Initially they contend that REA, not Reaemco, was the "target" of the alleged conspiracy, and that under the "target area" rule Reaemco cannot present claims under the antitrust laws for injuries to another. With regard to those actions allegedly directed against Reaemco itself, defendants assert that Reaemco had no business or property to be injured, and hence no injury cognizable under the antitrust laws. Defendants also rely on the so-called *Noerr–Pennington* doctrine, which immunizes efforts to influence governmental and judicial action from antitrust liability; and on the various related prior pro-

ceedings involving the REA bankruptcy, in which, defendants argue, many of Reaemco's claims were determined and by which Reaemco is bound.

As to Reaemco's Interstate Commerce Act claims, defendants argue that they should be dismissed as barred by the applicable statute of limitations or, alternatively, for failure to state a claim.

## II

### A. ANTITRUST CLAIMS

*Target area*

■ The law in the Second Circuit is settled that in order to state a claim for relief under section 4 of the Clayton Act, a plaintiff must be "within the 'target area' of the alleged antitrust conspiracy, i. e., a person against whom the conspiracy was aimed, such as a competitor of the persons sued." *Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc.*, 454 F.2d 1292, 1295 (2d Cir. 1971), *cert. denied*, 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972). *See, e. g., Long Island Lighting Co. v. Standard Oil Co. of California*, 521 F.2d 1269, 1274 (2d Cir. 1975), *cert. denied*, 423 U.S. 1073, 96 S.Ct. 855, 47 L.Ed.2d 83 (1976); *Billy Baxter, Inc. v. Coca–Cola Co.*, 431 F.2d 183, 187 (2d Cir. 1970), *cert. denied*, 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971); *Dominicus Americana Bohio v. Gulf & Western Industries, Inc.*, 473 F.Supp. 680, 691 (S.D.N.Y.1979) (Carter, J.); *Star Lines, Ltd. v. Puerto Rico Maritime Shipping Authority*, 451 F.Supp. 157, 159 (S.D.N.Y.1978) (Carter, J.). A target is defined as "a person or business against which competitive aim is taken . . . an object of an antitrust conspiracy." *Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc., supra*, 454 F.2d at 1296 n.2. This rule "draw[s] a line excluding those who have suffered economic damage by virtue of their relationships with 'targets' or with participants in an alleged antitrust conspiracy, rather than by being 'targets' themselves." *Id.* at 1295.

As a result of the application of the target area rule, a plaintiff asserting an antitrust treble damages claim, "in addition to the ordinary requirement of causation . . 'must allege a causative link to his injury which is "direct" rather than "incidental" or which indicates that his business or property was in the "target area" of the defendant's illegal act.'" *NAACP v. New York Clearing House Ass'n*, 431 F.Supp. 405, 408 (S.D.N.Y.1977) (Weinfeld, J.), *quoting Billy Baxter, Inc. v. Coca–Cola Co., supra*, 431 F.2d at 187. The Court of Appeals explained the rationale behind this "rule of reason" as to antitrust standing, *Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc., supra*, 454 F.2d at 1296, as follows:

[The rule] respects the purpose of § 4 of the Clayton Act, which is to provide a private enforcement weapon that will deter violation of the federal antitrust laws by permitting any person injured in his business by reason of an antitrust violation to recover treble the damages actually suffered. It acknowledges that while many remotely situated persons may suffer damage in some degree as the result of an antitrust violation, their damage is usually much more speculative and difficult to prove than that of a competitor who is an immediate victim of the violation. Furthermore if the flood–gates were opened to permit treble damage suits by every creditor, stockholder, employee, subcontractor, or supplier of goods and services that might be affected, the lure of a treble recovery . . . would result in an over–kill, due to an enlargement of the private weapon to a caliber far exceeding that contemplated by Congress.

*Id.* at 1295.

■ This rule obviously bars Reaemco from asserting a claim based on defendants' actions against REA, most if not all of which allegedly occurred before Reaemco even was created, regardless of any indirect effect those actions may have had on Reaemco.[3] In addition, it prevents Reaem-

---

**3.** Reaemco relies on *Mulvey v. Samuel Goldwyn Productions*, 433 F.2d 1073 (9th Cir.

1970), *cert. denied*, 402 U.S. 923, 91 S.Ct. 1377, 28 L.Ed.2d 662 (1971), for the proposition that,

co from asserting former REA employees' claims. The employees, as much as Reaemco, lack standing to sue for injuries to REA from which they suffered indirectly. *Hans Hansen Welding Co. v. American Ship Building Co.*, 1973–2 Trade Cas. ¶ 74,739 at 95,239 (S.D.N.Y.1973) (Tyler, J.); *Bywater v. Matshushita Electric Industrial Co.*, 1971 Trade Cas. ¶ 73,759 at 91,202 (S.D.N.Y.1971) (MacLean, J.) Nor can the former employees sue as creditors of REA, because creditors of a target are not themselves targets. *Productive Inventions, Inc. v. Trico Products Corp.*, 224 F.2d 678, 679 (2d Cir. 1955), *cert. denied*, 350 U.S. 936, 76 S.Ct. 301, 100 L.Ed. 818 (1956); *Loeb v. Eastman Kodak Co.*, 183 F. 704, 709 (3d Cir. 1910); *Westmoreland Asbestos Co. v. Johns–Manville Corp.*, 30 F.Supp. 389, 391 (S.D.N.Y.1939) (Mandelbaum, J.), *aff'd*, 113 F.2d 114 (2d Cir. 1940) (per curiam). Even if the employees themselves had standing as targets, Reaemco could not sue derivatively to assert their claims. *NAACP v. New York Clearing House Ass'n, supra*, 431 F.Supp. at 410; *Nassau County Ass'n of Insurance Agents, Inc. v. Aetna Life and Casualty Co.*, 361 F.Supp. 967, 969 (S.D.N.Y.1973) (Stewart, J.), *aff'd*, 497 F.2d 1151 (2d Cir.), *cert. denied*, 419 U.S. 968, 95 S.Ct. 232, 42 L.Ed.2d 184 (1974).

Application of the target area test thus eliminates all allegations of illegal conduct except those of actions taken directly against Reaemco. These claims must now be tested against the yardstick for determining a viable private action for damages under section 4 of the Clayton Act.

*Injury to business or property*

Section 4 requires that, in order to recover damages, a plaintiff must show that he was "injured in his business or property by reason of anything forbidden in the anti-

trust laws." 15 U.S.C. § 15; *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 126, 89 S.Ct. 1562, 1578, 23 L.Ed.2d 129 (1969). Absent such a showing, a plaintiff lacks standing to seek damages under section 4. *See Duff v. Kansas City Star Co.*, 299 F.2d 320, 325 (8th Cir. 1962); *Peller v. International Boxing Club, Inc.*, 227 F.2d 593, 595 (7th Cir. 1955); *Laurie Visual Etudes, Inc. v. Chesebrough–Pond's, Inc.*, 473 F.Supp. 951, 955 (S.D.N.Y.1979) (Weinfeld, J.); *Waldron v. British Petroleum Co., Ltd.*, 231 F.Supp. 72, 81 (S.D.N.Y.1964) (Herlands, J.).

*Preparedness rule*

■ Reaemco does not assert that it was injured in its property (or that it had any property) or that it had a going business that was injured. The complaint claims that the injury suffered was Reaemco's inability to succeed to REA's business, for which sole purpose Reaemco was organized. Therefore, Reaemco relies on the principle, first stated in *American Banana Co. v. United Fruit Co.*, 166 F. 261, 264 (2d Cir. 1908), *aff'd*, 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826 (1909), that "it is as unlawful to prevent a person from engaging in business as it is to drive a person out of business." The court there qualified this concept by requiring the prospective competitor to demonstrate that he possessed "an intention and preparedness to engage in business." *Ibid.* That showing remains a prerequisite to a valid antitrust claim for exclusion from a business. *See, e. g., Hecht v. Pro–Football, Inc.*, 570 F.2d 982, 994 (D.C.Cir.1977), *cert. denied*, 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978); *Martin v. Phillips Petroleum Co.*, 365 F.2d 629, 633 (5th Cir.), *cert. denied*, 385 U.S. 991, 87 S.Ct. 600, 17 L.Ed.2d 451 (1966); *Laurie Visual Etudes,*

because its damages "could reasonably be foreseen," *id.* at 1076, it has standing to assert its claim under section 4 of the Clayton Act. The holding in *Mulvey* is contrary to the law of this circuit, however. *Id.* at 1076 n.4 (specifically disagreeing with the result in *Fields Productions, Inc. v. United Artists Corp.*, 432 F.2d 1010 (2d Cir. 1970) (per curiam), *cert. denied*, 401 U.S. 949, 91 S.Ct. 932, 28 L.Ed.2d 232

(1971)). The rule in this circuit is that "even parties whose injuries may be both immediate and foreseeable may lack standing to pursue a private remedy if that injury is indirect or incidental, or if their business was not in the target area of the allegedly illegal acts." *Long Island Lighting Co. v. Standard Oil Co. of California, supra*, 521 F.2d at 1274.

*Inc. v. Chesebrough–Pond's, Inc., supra*, 473 F.Supp. at 955–56. Although Reaemco's intent is conceded, defendants argue that the complaint does not allege facts from which preparedness can be inferred.

Courts have determined preparedness by reference to several factors, the absence of any one of which may defeat the allegation. They include: (1) plaintiff's background and experience in the proposed business; (2) any affirmative action by plaintiff to engage in the activity; (3) plaintiff's ability to finance the enterprise; and (4) consummation of contracts to enter the business. *E. g., Hecht v. Pro–Football, Inc., supra*, 570 F.2d at 994; *Laurie Visual Etudes, Inc. v. Chesebrough–Pond's, Inc., supra*, 473 F.Supp. at 955–56; *Waldron v. British Petroleum Co., Ltd., supra*, 231 F.Supp. at 81–82. A plaintiff cannot satisfy the requirement that he be injured in his "commercial interests," *Hawaii v. Standard Oil Co. of California*, 405 U.S. 251, 264, 92 S.Ct. 885, 892, 31 L.Ed.2d 184 (1972), if he has "nothing beyond a hope or expectation" of engaging in business. *Image and Sound Service Corp. v. Altec Service Corp.*, 148 F.Supp. 237, 239 (D.Mass.1956). *See Peller v. International Boxing Club, Inc., supra*, 227 F.2d at 595 ("never . . . anything more than a hope"); *Laurie Visual Etudes, Inc. v. Chesebrough–Pond's, Inc., supra*, 473 F.Supp. at 957 (plans contingent upon "non–existent but hoped–for contract"); *Broadcasters, Inc. v. Morristown Broadcasting Corp.*, 185 F.Supp. 641, 644 (D.N.J.1960) ("nothing more than an expectation" of engaging in business "if the [broadcasting] license were granted").

■ As recited above, Reaemco's sole claimed injury was its inability to succeed to REA's business and operating authorities. It does not claim any injury to any other activities and, indeed, seems to have had no other pursuits. As to the four criteria listed above, Reaemco apparently satisfied the first and second, if its proposal to purchase REA's operating authorities is construed as affirmative action to engage in the business. It did not consummate any contracts, however; nor does it claim to have had the financial resources to effectuate its plan to succeed REA. "Its chief asset was a 'hope' and a hypothetical plan. . . . However, no part of the REAEMCO plan called for the production and presentation of new money because there was none." *Manning, supra*, 558 F.2d at 1129. Thus Reaemco cannot argue that it possessed the attributes of preparedness.[4]

---

4. In *Laurie Visual Etudes, Inc. v. Chesebrough Pond's, Inc., supra*, 473 F.Supp. 951, plaintiff was an established company with long experience in the distribution of musical products. It developed and held a patent on a medical device, and wished to enter that field. Contingent upon its locating a distributor, plaintiff contracted with a manufacturer to make the device, and entered into substantial negotiations with potential distributors, one of which was the defendant. The negotiations collapsed, and plaintiff sued defendant for preventing its entry into the medical devices business. Judge Weinfeld held that plaintiff lacked standing to sue under section 4 of the Clayton Act because it did not satisfy the preparedness criteria, relying on plaintiff's newness in the medical devices field, its failure to demonstrate the financial capacity to develop the device, and its inability to secure a distribution arrangement. *Id.* at 956–57. He concluded that "the only reason for [plaintiff's] nonentry . . . has been its own incapacity." *Id.* at 958.

In *Martin v. Phillips Petroleum Co., supra*, 365 F.2d 629, plaintiff "had engaged in the leasing, exploration, drilling, gas processing, as well as the operation and management of producing oil and gas properties and the sale and marketing of products therefrom. . . . [and] had also engaged in the gathering and transporting of natural gas." *Id.* at 632. However, because he "had never been engaged in either the ownership or operation of a gasoline plant or in marketing the products thereof," *ibid.*, lacked financing, and had made no investment in new facilities or equipment, *id.* at 634, plaintiff lacked standing to sue a defendant that replaced him in a proposed acquisition of a gas plant. Plaintiff "was unprepared to either enter the new business or to expand his existing business to include the gasoline plant purchase and operation. He was thus not injured in his business or property within the meaning of § 4." *Ibid.*

In *Peller v. International Boxing Club, Inc., supra*, 227 F.2d 593, a plaintiff without former fight promotion experience who undertook substantial negotiations toward the promotion of a professional boxing match, including preliminary financial arrangements and discussions with boxers, was found to lack business or property capable of injury under the Clayton Act, and was therefore without standing to sue

## Noerr–Pennington doctrine

■ Implicitly recognizing its inability to meet the preparedness standard, Reaemco instead suggests that "it naturally follows that Reaemco would have more difficulty raising capital because of defendants' antitrust laws violation," Plaintiff's Mem. 9, and argues that whether or not it would have obtained financing but for defendants' alleged illegal acts is a jury question. *Ibid.* This would be correct except that, on the face of the complaint and from the parties' arguments, it is apparent that any acts of defendants that deprived Reaemco of financing were not illegal. In such circumstances, where "plaintiff can prove no set of facts in support of his claim which would entitle him to relief," dismissal is appropriate.[5] *Hospital Building Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 746, 96 S.Ct. 1848, 1853, 48 L.Ed.2d 338 (1976).

Here, the alleged illegal conduct was campaigning against federal loans to Reaemco, apparently successfully. Although the complaint gives no details, the airline defendants suggest that this effort presumably was directed at Congress, Airline Mem. 36; Airline Reply Mem. 6, and plaintiff does not say otherwise. But regardless of what branch or agency of the federal government was the object of the alleged campaign, defendants' actions as described in the complaint do not constitute a violation of the antitrust laws, but are protected by the *Noerr–Pennington* doctrine.

In *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), the Court unanimously held that concerted conduct to influence public officials to pass or enforce laws does not violate the Sherman Act, regardless of its anticompetitive purpose or effect and regardless of whether such conduct could be characterized as unethical. *Id.* at 135–36, 138–41, 81 S.Ct. at 528–529, 530–531. The Court's reasons were several: the Sherman Act was not intended to regulate political conduct; governmental action, otherwise valid, that restrains trade or monopolizes does not violate the Sherman Act, just because such action was taken in response to lobbying; and a contrary conclusion would implicate constitutional questions of Congress' power to limit the First Amendment right of petition. *Id.* at 137–38, 81 S.Ct. at 529–530. One exception was stated: where "a publicity campaign, ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor . . . the application of the Sherman Act would be justified." *Id.* at 144, 81 S.Ct. at 533.

under the Act. "[A]t most, [plaintiff] only . . desired to enter the business . . . ." *Id.* at 596.

In comparison with the plaintiffs in the above cases, none of which was found to possess the attributes of preparedness, Reaemco's failure to satisfy the preparedness standard requisite to standing under section 4 of the Clayton Act is evident. Reaemco had no financing, no business record, no property or operating facilities, and no contracts to do business. All it had was a plan to enter the express business and an unfinanced proposal to purchase REA's operating authorities. These "assets" are clearly insufficient to establish preparedness.

5. For example, in *Broadcasters, Inc. v. Morristown Broadcasting Corp., supra,* 185 F.Supp. 641, plaintiff complained that defendants' FCC license application, which was inconsistent with its own application, was made pursuant to an illegal conspiracy to restrain trade by impeding and delaying consideration of plaintiff's application. The court granted defendants' motion to dismiss for failure to state a claim upon which relief could be granted, relying on two independent bases. First, the court found the actions complained of to have been legal and not violations of the antitrust laws. Second, plaintiff "failed to allege facts from which it may be inferred that [it] sustained an injury to 'business or property.'" *Id.* at 644. Plaintiff apparently was a new company organized specifically to obtain a license and operate a radio station, and the court held that its activities in pursuit of a license did not constitute a commercial enterprise but merely an "expectation" of conducting such a venture contingent on obtaining a license. *Ibid.* Plaintiff claimed that the reason for its failure to realize that expectation was defendants' acts, but the court found those acts not illegal and dismissed the complaint. Although the analogy to the instant case is imperfect, *Broadcasters* is close enough to warrant some reliance.

The holding in *Noerr* is explicit that an anticompetitive purpose does not render illegal genuine efforts to influence governmental action. The lower courts in *Noerr* had relied on the fact that defendants' "sole purpose in seeking to influence the passage and enforcement of laws was to destroy [plaintiffs] as competitors," *id.* at 138, 81 S.Ct. at 530, but the Court could "not see how this fact . . . could transform conduct otherwise lawful into a violation of the Sherman Act. . . . The right of the people to inform their representatives in government of their desires with respect to the passage or enforcement of laws cannot properly be made to depend upon their intent in doing so." *Id.* at 138–39, 81 S.Ct. at 530. The Court thus held that, "at least insofar as the [defendants'] campaign was directed toward obtaining governmental action, its legality was not at all affected by any anticompetitive purpose it may have had." *Id.* at 139–40, 81 S.Ct. at 531.

In *United Mine Workers v. Pennington*, 381 U.S. 657, 670, 85 S.Ct. 1585, 1593, 14 L.Ed.2d 626 (1965), the Court reaffirmed the *Noerr* holding:

Noerr shields from the Sherman Act a concerted effort to influence public officials regardless of intent of purpose. . . Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act.

*California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972), represented the next development in this doctrine. This case applied to judicial and adjudicatory administrative proceedings the same antitrust immunity conferred in *Noerr* and *Pennington* upon actions to influence non–adjudicatory legislative or executive decision–making.[6] *Id.* at 510–11, 92 S.Ct. at 611–612. The Court found it necessary, however, to modify the so–called "sham exception" to this immunity, first articulated in *Noerr*, because of differences between the adjudicatory process and the procedures employed in the legislative and regulatory forums dealt with in *Noerr* and *Pennington* : unethical conduct and misrepresentations, tolerated in a political context, can illegally corrupt adjudicatory proceedings by barring a party from effective access to these forums. 404 U.S. at 512–13, 92 S.Ct. at 612–613. Thus, the Court held, where defendants abuse the judicial or administrative adjudicatory process by "a pattern of baseless, repetitive claims" against plaintiff, undertaken not to influence official behavior, *see Noerr, supra*, 365 U.S. at 144, 81 S.Ct. at 531, 533, but to produce the "illegal result [of] effectively barring [plaintiff] from access to the agencies and courts," 404 U.S. at 513, 92 S.Ct. at 613, the sham exception applies and such conduct is not immune from antitrust liability. The core element of this modified and expanded *California Motor Transport* sham exception in cases involving judicial and quasi–judicial proceedings is the effective exclusion of a party from access to the decision–making process. *Miracle Mile Associates v. City of Rochester*, 617 F.2d 18, 21 (2d Cir. 1980); *Wilmorite, Inc. v. Eagan Real Estate, Inc.*, 454 F.Supp. 1124, 1134–35

---

**6.** *Woods Exploration & Producing Co., Inc. v. Aluminum Co. of America*, 438 F.2d 1286 (5th Cir. 1971), *cert. denied*, 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972), and *George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.*, 424 F.2d 25 (1st Cir.), *cert. denied*, 400 U.S. 850, 91 S.Ct. 54, 27 L.Ed.2d 88 (1970), cited by Reaemco in opposition to the application of the *Noerr–Pennington* doctrine, are thus inapposite. Reaemco relies on *Woods* for its statement that antitrust policies "should not be sacrificed simply because defendants employ governmental processes to accomplish anticompetitive purposes." 438 F.2d at 1296. This statement was made in the context of a holding restricting the application of the *Noerr–Pennington* doctrine to situations in which the passage or enforcement of laws was specifically at stake. This holding, however, was implicitly overruled by the subsequent decision in *California Motor Transport*. Similarly, Reaemco's argument, based on *Whitten*, that the *Noerr–Pennington* doctrine insulates only those acts aimed at influencing governmental action on broad policy questions involving the passage or enforcement of legislation, and not actions related to narrow issues between specific parties, must be rejected in light of *California Motor Transport's* contrary conclusion.

(N.D.N.Y.1977), *aff'd*, 578 F.2d 1372 (2d Cir.), *cert. denied*, 439 U.S. 983, 99 S.Ct. 573 (1978).

These and subsequent cases indicate three principal criteria, first explicitly outlined in *Mountain Grove Cemetery Ass'n v. Norwalk Vault Co.*, 428 F.Supp. 951, 954–55 (D.Conn.1977), for determining whether allegedly illegal conduct is immune from antitrust regulation or comes within the sham exemption: (1) the impact of regulation on First Amendment values, (2) the nature of the challenged conduct, and (3) the frequency of repetition of the challenged conduct.[7]

In the instant case, Reaemco's allegation that defendants' conspiracy to prevent it from obtaining federal loans violated the Sherman Act must fall under this three–part analysis. First, federal loans presumably are sought and granted or denied in a legislative or quasi–legislative context, and thus the First Amendment right of petition is directly implicated. Second, the complaint alleges no abuses whatsoever in connection with defendants' campaign.[8] Third, there is no allegation that defendants engaged in a repetitive pattern of conduct to deny plaintiff access to federal loan–granting authorities.[9] Thus Reaemco cannot invoke the sham exception, and defendants' actions, which Reaemco claims deprived it of the opportunity to obtain the finances necessary to satisfy the preparedness test, are protected by the *Noerr–Pennington* doctrine and were not violative of the antitrust laws.

It is elementary that if factors other than a defendant's illegal conduct prevent a plaintiff from entering a market, plaintiff has not been injured "by reason of" defendants' actions and cannot recover

7. The facts and holding in *Mountain Grove Cemetery* are instructive. Defendants had filed a lawsuit against plaintiff in state court alleging that plaintiff's business violated state law and restrained trade. Plaintiff responded with a federal action claiming that defendants' acts constituted a violation of the antitrust laws. Applying the three–part test described in the text, the court dismissed plaintiff's complaint, finding that defendants' actions were protected from antitrust liability by the sham exception in *California Motor Transport.* 428 F.Supp. at 955. The opinion emphasized the interplay of all three criteria for application of the sham exception, noting that if a single lawsuit could constitute an antitrust violation, absent allegations of the specific abuses described in *California Motor Transport* (e. g., perjury, fraudulently obtained patent, conspiracy with or bribery of an official, 404 U.S. at 512–13, 92 S.Ct. at 612–613), then any business would hesitate before seeking adjudication of its rights vis–a–vis a competitor. 428 F.Supp. at 955–56. Following *Noerr* and *California Motor Transport,* the court resolved the tension between antitrust policy and the right to petition for government action in favor of protecting the First Amendment right. *Ibid. See Bethlehem Plaza v. Campbell,* 403 F.Supp. 966, 970–71 (E.D.Pa. 1975).

8. In fact, if the loans were sought in a legislative forum, as assumed here on the basis of defendants' uncontroverted suggestion, the narrow *Noerr* sham exception, rather than the expanded *California Motor Transport* version, would apply. *See Metro Cable Co. v. CATV of Rockford, Inc.,* 516 F.2d 220, 228 (7th Cir. 1975). Therefore, because Reaemco does not claim that the alleged campaign against loans was "nothing more than an attempt to interfere directly with [Reaemco's] business relationships," *Noerr, supra,* 365 U.S. at 144, 81 S.Ct. at 533, rather than a genuine effort to influence governmental action, the activity complained of does not qualify for the applicable sham exception. Even if the loans in question were sought in a judicial or quasi–judicial setting, however, and the expanded exception of *California Motor Transport* applied, plaintiff could not prevail. The complaint here, like the one found lacking in *Mountain Grove Cemetery Ass'n v. Norwalk Vault Co., supra,* 428 F.Supp. 951, contains no allegations of any abuses of the adjudicatory process resulting in Reaemco having been barred from access to any tribunal, which is a prerequisite to satisfaction of the *California Motor Transport* yardstick. *See Miracle Mile Associates v. City of Rochester, supra,* 617 F.2d at 21; *Wilmorite, Inc. v. Eagan Real Estate, Inc., supra,* 454 F.Supp. at 1134–35.

9. In this respect, the instant complaint is again similar to the one dismissed in *Mountain Grove Cemetery Ass'n v. Norwalk Vault Co., supra,* 428 F.Supp. 951, and in striking contrast to those found to qualify for the sham exception in *California Motor Transport* and *Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359; *on remand,* 360 F.Supp. 451 (D.Minn.1973), *aff'd,* 417 U.S. 901, 94 S.Ct. 2594, 41 L.Ed.2d 207 (1974) (allegations of repetitive use of litigation timed and designed to prevent plaintiff from establishing business competing with defendant).

under Clayton Act § 4. *See Zenith Radio Corp. v. Hazeltine Research, Inc., supra,* 395 U.S. at 126–27, 89 S.Ct. at 1578–1579. That is the situation here. The actions taken by defendants that Reaemco must rely upon for its standing to sue–it cannot possibly prove injury to business or property under the preparedness test unless it argues successfully that defendants' efforts illegally deprived it of financial wherewithal–are not subject to antitrust regulation. Therefore, defendants cannot be held liable for Reaemco's failure to meet the preparedness standard, and Reaemco lacks the property or business injury which is prerequisite to a treble damages action.[10] Reaemco thus is without standing to assert a claim under

section 4 of the Clayton Act, and all of its antitrust claims must be dismissed.[11]

## B. INTERSTATE COMMERCE ACT CLAIMS

Plaintiff's claims under the Interstate Commerce Act ("Act") are made pursuant to sections 5 and 8 thereof, 49 U.S.C. §§ 5, 8. Section 5 outlaws agreements among common carriers to pool or divide traffic, services or earnings. Section 8 provides for the recovery of actual damages and attorneys' fees for violations of section 5. Section 16(3)(b), 49 U.S.C. § 16(3)(b),[12] limits actions under section 8 to those brought within two years of the accrual of the cause of action.[13]

**10.** An alternative approach to the same result is suggested by the foregoing analysis, under the rubric of "injury to business or property," of Reaemco's allegations of actions taken against it. As can be inferred from the above discussion, none of defendants' alleged actions directly against Reaemco were illegal under the antitrust laws. First, as explained above, the campaign against federal loans is immunized from antitrust liability by the *Noerr–Pennington* doctrine. Second, Reaemco's claim that defendants thwarted its plan through the sale of REA's operating authorities to Alltrans must fail because the decision to approve Alltrans' bid over Reaemco's was made by Judge Galgay, after extensive hearings, and not by defendants. Reaemco has fully tested the validity *of that decision in the courts and lost. In re REA Holding Corp., supra,* 447 F.Supp. 167. Even if defendants' actions in this regard were illegal, they cannot be held liable where factors independent of their conduct–*i. e.,* Judge Galgay's decision–were responsible for Reaemco's claimed injury. *See Zenith Radio Corp. v. Hazeltine Research, Inc., supra,* 395 U.S. at 126–27, 89 S.Ct. at 1578–1579. Here, though, defendants' actions were immunized by the *Noerr–Pennington* doctrine and not illegal: after six days of hearings before Judge Galgay on its and Alltrans' proposals, Reaemco cannot plausibly claim it was denied full access to the adjudicatory process by defendants' acts.

Finally, Reaemco's conclusory allegation that defendants so harassed Reaemco by the use of administrative and judicial proceedings as to deny it access to such proceedings fails to state a claim. Such a conclusory assertion, standing alone, is insufficient to qualify for the sham exception in *Noerr* and *California Motor Transport.* Nowhere does the complaint explain in what manner or forum Reaemco was prevented from presenting its case. *Cf. Franchise Realty Interstate Corp. v. San Francisco Local Joint Executive Board of Culinary Workers,* 542 F.2d

1076, 1079, 1081 (9th Cir. 1976), *cert. denied,* 430 U.S. 940, 97 S.Ct. 1571, 51 L.Ed.2d 787 (1977) (complaint alleging that defendants opposed plaintiff's license applications with a series of frivolous oppositions, without alleging how this limited plaintiff's access to licensing authority, dismissed as failing to satisfy sham exception). Nor do Reaemco's arguments against the instant motions give any indication of actions by defendants intended to "usurp [the] decisionmaking process" by barring Reaemco from "meaningful access to adjudicatory tribunals." *California Motor Transport, supra,* 404 U.S. at 512, 92 S.Ct. at 612. *See Miracle Mile Associates v. City of Rochester, supra,* 617 F.2d at 21.

Even if Reaemco were able to show that it was injured in its business or property, therefore, such injury would not be "by reason of anything forbidden in the antitrust laws." Clayton Act § 4, 15 U.S.C. § 15. Its antitrust claims would therefore be dismissed for failure to state a claim upon which relief can be granted. Rule 12(b)(6), F.R.Civ.P.

**11.** Because defendants' first two grounds for dismissal–lack of standing and the protection of the *Noerr–Pennington* doctrine–dispose of all the issues raised by Reaemco's antitrust claims, it is unnecessary to consider their final argument, the *res judicata* and collateral estoppel *effect of previous related cases upon* various of Reaemco's allegations.

**12.** This provision is found at 49 U.S.C. § 11706(c)(1) under the amended Act. *See* note 1, *supra.*

**13.** Although *section 16(3)(b) refers to* complaints "filed with the Commission," it is well settled that its limitations period also applies to actions initiated in district court. *Kansas City Southern Ry. Co. v. Wolf,* 261 U.S. 133, 138–39,

The actions by defendants alleged in the complaint to have violated the Act are the "devising and implementing" of an agreement to control REA (Complaint ¶ 4(a)) and, more specifically, the use of this agreement to fix payment, price and other terms for the provision of services to REA (Complaint ¶ 8(g)). As REA ceased operation in November, 1975, and Reaemco's complaint was not filed until December, 1978, it is apparent that the claimed violations took place more than two years before the commencement of the instant action, which therefore is barred by section 16(3)(b).[14]

Burlington points out another defect in Reaemco's claim under the Act: even if not barred by the limitations statute, the complaint fails to state a claim under section 8. The basis for this argument is that Reaemco has not alleged any injury to itself resulting from the purported violations of the Act. "[B]efore any party can recover under the act he must show not merely the wrong of the carrier, but that the wrong has in fact operated to his injury." *Pennsylvania Railroad Co. v. International Coal Mining Co.*, 230 U.S. 184, 200, 33 S.Ct. 893, 897, 57 L.Ed. 1446 (1913); *see Shaw Warehouse Co. v. Southern Railway Co.*, 288 F.2d 759, 775 (5th Cir. 1961), *cert. denied*, 369 U.S. 850, 82 S.Ct. 933, 8 L.Ed.2d 9 (1962). It is difficult to imagine how Reaemco could have been damaged by the alleged agreement, which was directed at another company that had ceased to exist by the time of Reaemco's birth, and the complaint provides no enlightenment on this question. Reaemco has not stated a claim upon which relief can be granted under the Interstate Commerce Act.

For the reasons stated above, all defendants' motions to dismiss the complaint are granted.[15]

IT IS SO ORDERED.

---

43 S.Ct. 259, 260–261, 67 L.Ed. 571 (1923); *A. J. Phillips Co. v. Grand Trunk Western Railway Co.*, 236 U.S. 662, 667, 35 S.Ct. 444, 446, 59 L.Ed. 774 (1915); *Louisville & N.R. Co. v. Cory*, 54 F.2d 8, 10·11 (6th Cir. 1931); *Feinstein v. New York Central Railroad Co.*, 159 F.Supp. 460, 466 (S.D.N.Y.1958) (Hand, J.). Section 16(3)(b) "not only bars the remedy but destroys the liability." *A. J. Phillips Co. v. Grand Trunk Western Railway Co., supra*, 236 U.S. at 667, 35 S.Ct. at 446.

14. Burlington and Shearson both made this argument in their memoranda in support of their motions to dismiss (at 553–554 and 551, respectively), and Reaemco neglected to respond.

15. As stated in note 1, *supra*, Reaemco's claims under state law are dismissed for failure to state a claim. In addition, because all of Reaemco's other claims based on federal law are dismissed, these pendent claims, if there is any substance to them, would be resolved more appropriately in the courts of New York, and are dismissed on this basis as well. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726–27, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966): "if the federal issues are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."